Argued and submitted April 19, reversed and remanded
for new trial August 4, reconsideration denied September 16,
petition for review denied November 2, 1982 (293 Or 801)

## STATE OF OREGON,
*Respondent,*

*v.*

## GARY DEAN LAWRENCE,
*Appellant.*

(No. 10-81-06989, CA A22397)

648 P2d 1332

Ross M. Shepard, Assistant Director, Public Defender Services of Lane County, Inc., Eugene, argued the cause and filed the brief for appellant.

Robert E. Barton, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Defendant appeals his conviction for unlawful possession of a controlled substance, ORS 475.992, assigning error to the trial court's denial of his pretrial motion to suppress LSD tablets seized from his property[1] during the booking process at the county jail after he was taken into protective civil custody for public intoxication. ORS 426.460.[2] The issue is whether the police may, without a

---

[1] It is unclear from the officers' testimony whether defendant was wearing the jacket when the plastic container was found during the booking procedure at the jail or whether the plastic box was discovered when the jacket was inventoried along with defendant's other personal property. According to Officer Carlile's testimony, defendant was not wearing the jacket at the time he was handcuffed and placed in the back seat of the patrol car at the restaurant. He stated that he placed the jacket in the trunk of his patrol car at the time. However, he later stated that he believed defendant was wearing the jacket at the jail when he was being booked, although he did not remember helping defendant put on the jacket. Officer Sawicki, the booking officer, when first asked on direct examination at the suppression hearing if the jacket was worn by defendant during the booking procedure, testified that she did not recall.

[2] ORS 426.460, prior to its amendment, Or Laws 1981, ch 809, § 1, provided in relevant part:

"(1) Any person who is intoxicated or under the influence of controlled substances in a public place may be taken or sent home or to a treatment facility by the police. However, if the person is incapacitated, the health of the person appears to be in immediate danger, or the police have reasonable cause to believe the person is dangerous to self or to any other person, the person shall be taken by the police to an appropriate treatment facility. A person shall be deemed incapacitated when in the opinion of the police officer or director of the treatment facility the person is unable to make a rational decision as to acceptance of assistance.

"(2) The director of the treatment facility shall determine whether a person shall be admitted as a patient, or referred to another treatment facility or denied referral or admission. If the person is incapacitated or the health of the person appears to be in immediate danger, or if the director has reasonable cause to believe the person is dangerous to self or to any other person, the person must be admitted.

"(3) In the absence of any appropriate treatment facility, an intoxicated person or a person under the influence of controlled substances who would otherwise be taken by the police to a treatment facility may be taken to the city or county jail where the person may be held until no longer intoxicated, under the influence of controlled substances or incapacitated.

"(4) Within 24 hours after admission, the director of the treatment facility or officer in charge of the jail shall notify in writing a court having probate jurisdiction in the county where the treatment facility or jail is located of the admission of the person. Unless the person has within 48 hours applied for voluntary admission to the treatment facility the person shall be discharged.

"* * * * *"

warrant, in a noncriminal, nonemergency situation open a closed container seized from the intoxicated person at the time he is booked in at the holding facility, when the purpose of doing so is to detect evidence of crime rather than to aid the person. We hold they may not do so and, therefore, reverse.

On May 22, 1981, at approximately 8 p.m., defendant was sitting in a booth at a restaurant in Springfield.[3] He appeared to be intoxicated and kept repeating to himself, "I'm going to die." Customers complained about defendant's conduct, so the restaurant manager spoke to him, determined that he was intoxicated and assisted him outside. Another restaurant employe had already called the police, and as the manager and defendant went to the adjacent parking lot, Officers Carlile and Deverell arrived in separate patrol cars.

Both officers testified that defendant appeared quite intoxicated; however, he was able to stand alone and was "totally cooperative," exhibiting no aggressive or combative behavior. Carlile asked defendant where he lived; defendant responded, "Here." When asked how much alcohol he had consumed, defendant stated, "Enough to put me away." Carlile then informed defendant that he would be taken into custody because he was intoxicated, unable to care for himself and was in a busy section of town where he could be harmed. Carlile handcuffed defendant, searched him for weapons and placed him in the back seat of his patrol car.

Carlile then contacted Buckley House, an alcoholic treatment facility, and requested a room for defendant. The facility was full and would not admit him. Although defendant at some point had informed Carlile of his home address, which was approximately 16 blocks from the restaurant, Carlile testified that it was department policy not to take intoxicated persons home but, rather, to place them either at Buckley House or the county jail.

Carlile gathered up defendant's belongings (a bicycle, a jacket and several other items), and as he was placing

---

[3] The trial judge did not make specific findings of fact. The facts are taken from the transcript of the suppression hearing.

them in the trunk of his patrol car, he searched the pockets of the jacket and found a clear plastic box containing a segment of a white plastic drinking straw, approximately 2-1/2 inches long with grey pieces of tape closing each end. Unable to "make out the significance of why the straw was in the box," Carlile returned the box to the jacket pocket and placed the jacket and defendant's other property, except the bicycle put in Deverell's car, into the trunk of his car. Defendant was then driven to jail.

At the jail, defendant was put through the booking process. Officer Sawicki, the booking officer, testified that their booking procedure was the same for one charged with crime as for one in civil custody: both are subjected to a thorough search of his person and property, and all property found is inventoried. During that process, Sawicki found the plastic box containing the piece of straw in the pocket of defendant's jacket. It is unclear, however, whether defendant was wearing the jacket at the time the box was discovered or whether the box was discovered as part of the inventory of defendant's personal property. *See* n 1, *supra.*

Sawicki opened the box, took out the straw, shook it and held it up to the light. Because it sounded like something was inside it, she handed the straw to Carlile and told him she believed something was inside. Carlile removed the grey tape closing each end of the straw, as well as small pieces of cotton stuffed in the ends, and observed numerous small, pink tablets. Believing the tablets to be contraband, he submitted them for analysis. The tablets were found to contain lysergic acid diethylamide, a controlled substance.

Defendant was indicted for possession of a controlled substance. He moved to suppress all evidence seized during the booking process on the grounds that (1) ORS 426.460, which authorizes the police to take intoxicated persons either home, or to a treatment or holding facility, was violated by the Springfield Police Department policy forbidding taking an intoxicated person home; (2) ORS 426.460 is unconstitutional in permitting seizure of a person for intoxication without probable cause to believe he has committed a crime and without opportunity for judicial

review, and (3) assuming the constitutionality of that statute, the warrantless search of the container found in the pocket of defendant's jacket was not incident to his arrest and there were no exigent circumstances justifying the violation of defendant's reasonable expectation of privacy.[4] The motion was denied; after a trial to the court on stipulated facts, defendant was convicted.

■    Because of our view of the case, we consider only defendant's third contention. On this record, there is no doubt that the officers were authorized under ORS 426.460 to take defendant into custody for his own benefit. He was obviously intoxicated, reeked of alcohol, was confused, did not know where he was or recall his address immediately and had told the restaurant manager he was going to die. The officers could have reasonably believed that defendant, if left alone, would harm himself.

■    Nonetheless, defendant was taken into custody in a noncriminal, nonemergency situation, as was the defendant in *State v. Newman,* 292 Or 216, 637 P2d 143 (1981), *cert den* 457 US 1111 (1982). In *Newman,* the court held that a search of the defendant's purse for identification at the scene of the stop was unreasonable, because it was not necessary to know her identity in order to take her to the holding facility as authorized by ORS 426.460. That reasoning strongly suggests that there was no necessity here for the police to search defendant's person or property at the scene, other than for their own safety if that was a concern. However, it is not that search, but the later one at the jail for the purpose of inventorying his belongings, that is challenged here. The court in *Newman* specifically declined to reach the question whether the intoxicated person's property could have been searched for identification as part of the booking process at the holding or treatment facility.

   *State v. Brown,* 291 Or 642, 634 P2d 212 (1981), on which the state relies, was the culmination of apparently

---

[4] On appeal, defendant argues these grounds and further that the statute treats persons with unnecessary rigor, Or Const Art I, § 13, and provides insufficient standards for determining how police should treat an intoxicated person. Defendant failed to raise those two contentions below. In any event, our disposition of the case makes it unnecessary to reach defendant's constitutional attack on the statute.

divergent case law (*e.g., United States v. Robinson,* 414 US 218, 94 S Ct 467, 38 L Ed 2d 427 (1973); *United States v. Chadwick,* 433 US 1, 97 S Ct 2476, 53 L Ed 2d 538 (1977)), relating to the authority of the police to open a closed container seized as an incident to a lawful arrest, absent a warrant. The court held that the container could be opened during the booking process as a delayed search incident to arrest. Here, however, defendant was not arrested (in the criminal sense), and there was no probable cause to justify an arrest. Neither was there an emergency, as in *State v. Marsh,* 1 Or App 351, 462 P2d 459 (1969), where defendant was taken into custody under ORS 426.215(1)[5] and transported to the police emergency hospital. We upheld the seizure of a packaged substance from the defendant as reasonably related to diagnosing or treating his apparent mental or physical condition. We said that the prompt identification of the substance seized might be the key to effective emergency treatment.[6] Here, there is no

---

[5] ORS 426.215(1) provides:

"(1) Any peace officer may take into custody any person who he has reasonable cause to believe is dangerous to himself or to any other person and who he has reasonable cause to believe is in need of immediate care, custody or treatment for mental illness. If a peace officer takes a person into custody under this section, he shall immediately remove him to the nearest hospital or other facility maintaining adequate staff and facilities as required under subsection (4) of this section. If more than one hour will be required to transport the person to the hospital or other facility from the location where the person was taken into custody, the peace officer shall, if possible, obtain a certificate from a physician licensed to practice medicine and surgery by the Board of Medical Examiners for the State of Oregon stating that the travel will not be detrimental to the person's physical health and that the person is dangerous to himself or to any other person and is in need of immediate care or treatment for mental illness. The physician shall personally examine the allegedly mentally ill person within 24 hours prior to signing the certificate."

[6] The state contends that the search of the container should be upheld under *State v. Marsh,* 1 Or App 351, 462 P2d 459 (1969), where the defendant was taken into protective custody as an emotionally disturbed person under ORS 426.215(1) and taken to a hospital for immediate treatment. En route to the hospital in a police patrol wagon, the officers searched defendant and discovered and seized two glassine packages containing marijuana and a metal "hide-a-key box" containing marijuana seeds. Defendant was subsequently charged and convicted for possession of marijuana. We upheld defendant's conviction, stating that:

"* * * the police, when lawfully taking a person into custody under ORS 426.215, have the right to search that person, not alone for such articles as may be lawfully seized following a valid arrest, but for such further objects, including pills or other apparent medications, as may appear reasonably related to diagnosing or treating his apparent mental or physical condition. * * *" 1 Or App at 354.

contention that defendant was other than intoxicated from alcoholic liquor and no contention that the pills were seized and analyzed for any purpose other than to charge defendant with a crime.

This case is closer to *Brown* on its facts than was *Newman* in the sense that here the search and seizure occurred during the booking process at the jail. However, the court in *Newman* emphasized the civil aspects of defendant's custody as opposed to the criminal arrest of Brown. As indicated above, the court declined to decide whether the result would have been different if the search of Newman's purse for identification had taken place at the jail during booking. Notwithstanding that declination, the court pointed out that it was unnecessary to know the identity of defendant in order to book her in, that intoxicated persons were booked in under various nicknames. That reasoning suggests that it would be unreasonable for the police to search the purse of one in civil custody *for the purpose of identification* at the time of booking, although inventorying the contents of the purse might be a different matter.[7]

■ Given the fact that the purpose of ORS 426.460 is to protect intoxicated persons by keeping them in custody for a limited period (48 hours), rather than treating them as criminals, it would be anomalous to treat them the same as one in full custody arrest for a criminal offense. What is reasonable in the latter case may not be in the former. Although the issue is not presented here, it would seem reasonable for an officer taking an intoxicated person into custody to conduct a limited "pat-down" search for weapons to ensure the safety of the officer, if the officer has a legitimate concern. As in *Newman,* it is not necessary to

---

In *Marsh,* defendant conceded that the search of his person for weapons or other objects related to his safety or that of others was proper. The only question was whether the officers had the right to seize what they recognized as marijuana in clear plastic bags. We held they did, citing *State v. Elkins,* 245 Or 279, 422 P2d 250 (1966).

[7] It is at least problematical whether an inventory of the contents of a closed container is necessary even when the person is being booked on criminal charges. As Linde, J., pointed out in his concurring opinion in *State v. Brown, supra:*

"* * * When there is no reason to fear some concrete danger from such a container, it may be good police procedure but it is hardly an 'exigent' necessity to inventory the contents without the assent of the person for whose protection this ostensibly is done. * * *" 291 Or at 660.

decide here whether an officer may search a person incident to taking him into civil custody; although such a search apparently occurred here, that search is not the crux of the problem. It is also reasonable for the booking officer to inventory (*see* ORS 133.455[8]) the property of the intoxicated person when he will be held in jail, even though not booked for a crime, in order to protect his property and to maintain the security of the detention facility.

However, the inventory process in noncriminal, nonemergency cases should be less intrusive than that considered reasonable in criminal cases. Once a closed container is taken from the person during inventory of his property and is in the exclusive control of the police, it is unreasonable to open the container and seize its contents without a warrant unless the contents are in plain view and are identified as contraband without the necessity of laboratory analysis.

To hold otherwise would give "rise to a set of constitutional problems inherent in a 'seizure' of a person for a non-penal purpose." *State v. Newman, supra,* 292 Or at 222. For the benevolent purposes of the statutory scheme to survive constitutional attack, the scheme must be administered in the spirit which brought about the decriminalization of the status crime of "public intoxication." As stated by Tanzer, J., in his dissenting opinion in *State v. Newman, supra,* 292 Or at 225, "The state was to be helper

---

[8] ORS 133.455 provides:

"(1) Whenever any jailer, peace officer or health officer takes or receives any money or other valuables from any person in custody for safekeeping or for other purposes, the officer or jailer receiving such valuables or money forthwith shall tender one of duplicate receipts for the property being surrendered to the person in custody. If possible, the person in custody shall countersign both the original and duplicate receipts. If the person is unable to sign the receipts or receive the duplicate thereof, the same shall be signed by and delivered to the person when reasonably possible. A file of the original receipts shall be kept for at least six months after the money or valuables have been returned to the person in custody, his agent or representative or other person entitled to the same.

"(2) A person violating any of the provisions of subsection (1) of this section commits a Class B misdemeanor."

The state contends that the statute authorizes the inventory of defendant's property in this case. We do not read it that way; rather, it requires that *whenever* property is taken from the person, an inventory must be prepared and given to the person.

or protector of the afflicted and no longer prosecutor of the criminal." Civil custody may not be used as a means or as an excuse for ferreting out criminal conduct.

Accordingly, the trial court erred in denying defendant's motion to suppress. The judgment is reversed and the case remanded for a new trial.