NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

ANTHONY DOUGLASS WHITE,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Appellant,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀Case No. 2D14-1201
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
STATE OF FLORIDA,⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Appellee.⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

Opinion filed June 10, 2015.

Appeal from the Circuit Court for Collier
County; James Shenko, Judge.

Howard L. Dimmig, II, Public Defender,
and Robert D. Rosen, Assistant Public
Defender, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Helene S. Parnes,
Assistant Attorney General, Tampa, for
Appellee.

ALTENBERND, Judge.

⠀⠀⠀⠀⠀⠀Anthony Douglass White appeals his judgment and sentence for

possession of ammunition by a convicted felon.  He entered a negotiated plea after the

trial court denied his dispositive motion to suppress.  The court sentenced him to four

years' imprisonment followed by six years' probation.  On appeal, he argues primarily

that contraband discovered during the initial phases of a civil detainment should not be admissible to prove a criminal charge. Although it may be true that the risk of such criminal prosecution may sometimes deter concerned citizens from reporting friends and relatives to law enforcement when civil detainment would be beneficial, at least under the facts of this case, we must affirm.

Following a call from a citizen concerned about a man lying in the road, a deputy located Mr. White lying with part of his body on the road. His backpack was next to him. Mr. White did not respond to the deputy at first and was unable to get up. Eventually the deputy helped him sit. Mr. White appeared very confused, and the deputy smelled a heavy odor of alcohol about his person. Although he had trouble answering the deputy's questions, Mr. White eventually told the deputy that his name was "Crunch" and that he had been "living in the woods." Mr. White said he had had "a lot" to drink that day. The deputy asked Mr. White numerous times if there was a sober adult who could care for him in his intoxicated state, but he never responded.

The deputy determined that Mr. White was intoxicated to the point where he could no longer care for himself and decided to take him into protective custody under what is commonly known as the "Marchman Act." See §§ 397.301, .675, .677, .6772, Fla. Stat. (2013). The Marchman Act allows a law enforcement officer to take an individual involuntarily into protective custody when the officer has a good faith belief that the individual is "substance abuse impaired" and, as a result of such impairment, "[h]as lost the power of self-control with respect to substance use" and is "likely to inflict[] physical harm on himself or herself or another" unless taken into protective custody. §§ 397.675, .677, .6772. An officer can either take the individual to a hospital

or licensed detoxification or addictions facility or, "[i]n the case of an adult, detain the person for his or her own protection in any municipal or county jail or other appropriate detention facility." § 397.6772(1).

It is undisputed in this case that adults processed under the Marchman Act in Collier County are taken to the county jail. At the time of his detainment, Mr. White confirmed that the backpack was his and that he wanted to take it with him. As a practical matter, even if Mr. White in his drunken state had said he did not want to take the backpack, the officer would not have been justified in simply abandoning the backpack at the side of the road. Once this man was detained, the officer needed to care for his property. The deputy also offered undisputed testimony that, as a matter of standard procedure, an inventory search of all persons entering the county jail and all personal effects accompanying them is conducted to prevent weapons and other contraband from entering the facility. As a result, before the deputy transported Mr. White to the jail, he searched the backpack without a warrant or valid consent because he knew it could not be brought into the jail without the search. In the process, the deputy discovered the ammunition that was the contraband involved in this offense.

As an initial matter, we do not agree with Mr. White that the trial court erred in concluding that the deputy was authorized to take Mr. White into protective custody for Mr. White's own safety. The officer's testimony supports a good faith belief that Mr. White had lost the power of self-control with respect to alcohol use and that he posed a danger to himself unless taken into protective custody. We do, however, agree with Mr. White that detention under the Marchman Act is not a criminal arrest and that the search of his backpack therefore cannot be authorized as a search incident to

- 3 -

arrest.  See § 397.6772(1) ("[D]etention [under this statute] is not to be considered an arrest for any purpose, and no entry or other record may be made to indicate that the person has been detained or charged with any crime.").  But because the statute expressly provides otherwise, Mr. White does not and cannot argue that it is improper for a county to process detainees under the Marchman Act at the local jail.  See id. Once the deputy took him to the jail, it was standard procedure to conduct an inventory search of him and any of his personal effects.  Accordingly, we conclude that the trial court properly determined that the contraband inevitably would have been discovered. Thus, the trial court properly denied this motion to suppress.  See Nix v. Williams, 467 U.S. 431, 441-44 (1984) (holding that the exclusionary rule does not apply where the prosecution can establish by a preponderance of the evidence that the evidence sought to be suppressed inevitably would have been discovered by lawful means); State v. Meola, 488 So. 2d 645, 645-46 (Fla. 2d DCA 1986) (concluding that a gun on the passenger seat of the defendant's car was admissible because the car was impounded and the gun inevitably would have been discovered during an inventory search).

We recognize that some jurisdictions have limited the permissive scope of an inventory search and accordingly suppressed evidence obtained when no arrest occurred and the defendant merely was taken into protective custody.  See, e.g., People v. Chaves, 855 P.2d 852, 853-55 (Colo. 1993) (en banc) (explaining that because "civil detainees cannot be treated as arrestees," the scope of an inventory search conducted pursuant to civil protective custody "is limited by the privacy interest of the detainee, and any closed containers must be set aside and a warrant obtained before they may be opened"); Lindsay v. State, 639 S.E.2d 584, 586-89 (Ga. Ct. App.

- 4 -

2006) ("[A] search of a civil detainee before being placed in a patrol car [and transported to jail], absent some valid reason for the officer to take custody of the clothing, container, or bag searched, [does not] come within the ambit of allowable inventory searches."); State v. Harlow, 465 A.2d 1210, 1213-14 (N.H. 1983) (concluding that the search of a civil detainee's wallet after he was transported to jail was not authorized by the state's civil protective custody statute but explaining in dicta that the search of larger containers might be necessary to ensure safety in jail); State v. Lawrence, 648 P.2d 1332, 1336-37 (Or. Ct. App. 1982) (concluding that the inventory search of a civil detainee transported to jail in the absence of an emergency "should be less intrusive than that considered reasonable in criminal cases" and that "[o]nce a closed container is taken from the [detainee] during inventory . . . it is unreasonable to open the container and seize its contents without a warrant").

Other jurisdictions, however, have declined to make any distinction, reasoning that the justification for an inventory search is the same whether the subject is a civil detainee or criminal arrestee. See, e.g., State v. Friend, 711 S.W.2d 508, 510-11 (Mo. 1986) (en banc) ("We find no substantial basis for holding that the reasons for a police inventory outlined by the United States Supreme Court . . . do not apply to property taken under police protection when the owner is civilly detained under police custody but not arrested."); Cordell v. Weber, 673 N.W.2d 49, 54-55 (S.D. 2003) (concluding that the removal of the civil detainee's clothing as part of booking procedure was justified because the rationale for inventory searches applies equally to civil detainees and criminal arrestees).

We understand that some counties in Florida have separate facilities to process and care for persons detained under protective custody. Thus, we leave open the issue of whether contraband discovered in a warrantless search of a backpack or other bag should be suppressed when the person under protective custody is not being transported to a jail and when the officer has no reason to believe that the item could not be safely transported in the trunk of the officer's vehicle.

From a Fourth Amendment perspective, as a matter of officer safety, it often may be reasonable for an officer to search an individual who is mentally ill or severely intoxicated prior to transporting the individual in the officer's vehicle to a safe haven. See, e.g., United States v. Harris, 747 F.3d 1013 (8th Cir. 2014) (explaining that a warrantless search or seizure by a police officer acting in a noninvestigatory, "community caretaking" function may be justified in certain limited situations, including those in which the search or seizure is necessary for officer safety). The same may sometimes be true for packs, purses, suitcases, and other large objects that can be separated from the detainee but could still contain dangerous material. In many ways, the debate is not a question of whether the officer should be permitted to search but whether the items found during a lawful search in this context should be deemed contraband that can result in a criminal prosecution. See State v. Hutchins, 636 So. 2d 552, 554 (Fla. 2d DCA 1994) (Altenbernd, J., concurring in part and dissenting in part) (suggesting the need for a statutory exclusionary rule under the "Meyers Act," the predecessor to the Marchman Act). The public policy question is whether we should prevent or limit prosecutions in these cases in order to promote the full and unfettered ability of law enforcement to "protect and serve" the community in cases involving the

mentally ill and impaired.  That, however, is a public policy issue for the legislature or for independent prosecutors and not for this court.

Affirmed.

MORRIS and SLEET, JJ., Concur.