IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 50841

STATE OF IDAHO,          )
                                     )

    Plaintiff-Appellant,      )      Boise, February 2025 Term
                                     )

v.                          )      Opinion Filed: August 11, 2025
                                     )

CORY LEE ADAMS,      )      Melanie Gagnepain, Clerk
                                     )

    Defendant-Respondent.     )

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Twin Falls County. Roger B. Harris, District Judge.

The order of the district court is <u>affirmed</u>.

Raúl R. Labrador, Idaho Attorney General, Boise, for Appellant, State of Idaho. Kenneth K. Jorgensen argued.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Defendant, Cory Lee Adams. Kiley A. Heffner argued.

_____

MEYER, Justice.

This case presents an issue of first impression: whether the warrantless search of a patient who was in civil protective custody under Idaho Code section 66-329 is permissible under the Fourth Amendment of the United States Constitution. We hold that the State did not demonstrate that the search either fell within one of the well-recognized exceptions to the Fourth Amendment's warrant requirement or was otherwise reasonable under the circumstances. We affirm the district court's decision to grant Cory Lee Adams' motion to suppress.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Adams was involuntarily committed to the custody of the director of the Department of Health and Welfare under Idaho Code section 66-329 in a separate Lincoln County case. After Adams' commitment, a St. Luke's Magic Valley Medical Center staff member contacted the Twin Falls Police Department to request assistance transporting Adams to Canyon View Hospital. Officers Comeau and Christensen were dispatched to the St. Luke's Emergency Room. When they arrived, Adams was cooperative. He complied with every request made by the officers and

1

voluntarily walked to the officers' patrol car. Before transporting Adams, Officer Christensen searched for weapons as a safety precaution. During the search, Officer Christensen felt something that he suspected was drug related. He reached into the left pocket of Adams' pants and pulled out a small plastic bag containing a substance that was later confirmed to be methamphetamine. The State charged Adams with a felony for possession of a controlled substance under Idaho Code section 37-2732(c)(1).

Claiming his Fourth Amendment rights were violated, Adams filed a motion to suppress the methamphetamine as evidence. In his motion, Adams first argued that because the officers were "simply providing [a] courtesy transport" and had no reasonable basis to believe Adams was armed and dangerous, the officers were not justified in performing a safety pat-down pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). Next, anticipating that the State would argue that Adams consented to the search, Adams asserted that he did not consent and emphasized that neither officer explicitly requested permission to search and that his hands were restrained behind his back. Alternatively, Adams contended that even if a safety frisk was justified by *Terry*, the "plain touch" or "plain feel" exception did not apply because body camera footage showed Officer Christensen immediately reaching into Adams' pocket without first conducting a pat-down. He also asserted that even if a pat-down occurred, a small baggie of methamphetamine could not be perceived as a weapon. It is unclear how the State responded because the State's opposition to the motion to suppress along with the memorandum in support of that opposition is not in the record.

At the evidentiary hearing, Officer Christensen was the only witness who testified. He testified that the hospital staff who contacted law enforcement requesting that Adams be transported to another facility reported that Adams was "not destructive—but confrontational." When the officers arrived, Adams "was calm with law enforcement." The officer further testified that during the pat-down, he did not feel anything resembling a weapon. Instead, the item felt like a "[w]added up piece of whatever" that seemed like "a drug-related item." Finally, he clarified that he was following his personal practice rather than a standard police department policy.

Based on Officer Christensen's testimony expressing uncertainty regarding departmental policy, the State clarified during oral argument that the Twin Falls Police Department had a standard police department policy directing officers to search every individual they put in their patrol cars. Then the State emphasized that Adams "had been declared mentally unstable," and the officers had safety concerns because "people take large amounts of drugs in the back seats of

2

[patrol] cars," which can lead to overdoses. Although the State did not explicitly claim that Officer Christensen was acting under his community caretaking role, the State relied on *State v. Cutler*, 143 Idaho 297, 141 P.3d 1166 (Ct. App. 2006), and *State v. Towner*, 169 Idaho 773, 503 P.3d 989 (2022), to argue that the search of Adams was reasonable. In response, Adams reiterated his arguments, as presented in his memorandum in support of his motion, that the search was unreasonable. He also criticized the State's reliance on unverified policy claims and highlighted Officer Christensen's testimony.

The district court subsequently granted Adams' motion to suppress. The court found that Adams was cooperative and "compliant with every request [the officers] made, and even voluntarily walked out to the car with them." In addition, Officer Christensen did not ask Adams for permission or consent to search his person; rather, "he told [Adams] that he was going to search him." Then, relying on *State v. Henage*, 143 Idaho 655, 152 P.3d 16 (2007), the court reasoned that the *Terry* frisk exception did not apply. Determining that Officer Christensen's "uncontroverted" testimony was that "he didn't believe [Adams] had any weapons" "combined with the fact that he didn't have any furtive movements or didn't act in a threatening matter," the court concluded that the Officer Christensen "invaded [Adams'] pocket without having a reasonable, articulable suspicion of having a weapon present . . . ." Finally, the district court concluded that the search was not justified under any recognized exception to the warrant requirement.

The State and Adams engaged in continual motion practice throughout the case. The State filed an objection to Adams' motion to suppress and supplemental brief in response to Adams' motion to suppress, a motion for reconsideration, and a memorandum in support of the State's motion for reconsideration. Adams filed an objection to and motion to strike the State's objection and supplemental brief in response to his motion to suppress, an objection to the State's motion for reconsideration, and a response to the State's motion. With exception to the State's perfunctory motion for reconsideration, which only requested a hearing on the motion, the contents of these filings are unknown as they are all omitted from the record.

The district court denied the State's motion for reconsideration without a hearing. In the court's memorandum decision and order denying the State's motion, the court reiterated its factual findings that Adams was cooperative with no signs of combative behavior. Adams complied and followed instructions without incident. While Officer Christensen did not believe Adams had any

3

hidden weapons, he conducted a pat-down search for weapons before placing Adams in the patrol car. However, acknowledging Adams' calm demeanor, Officer Christensen searched Adams' pants pocket, suspecting a flexible baggie might contain drugs. The court reasoned that

> even if the officer's initial interaction with Adams started out as a community caretaking function as argued by the State, the [c]ourt finds that it became investigatory as soon as [Officer] Christensen determined that there were no concealed weapons on Adams'[] person, and decided to continue with a more invasive search anyway.

The district court identified *State v. Fairchild*, 164 Idaho 336, 429 P.3d 877 (Ct. App. 2018), as persuasive and factually similar. The court explained that Officer Christensen testified that after completing his initial frisk, "which was probably more invasive than a simple *Terry* frisk" of outer clothing, "he did not have any reason to believe that Adams was armed and dangerous, nor was Adams acting aggressively." Finally, the district court recognized that the State supplemented the record showing that the Twin Falls Police Department had a department policy, but the court rejected the argument that internal policies supersede constitutional safeguards. The State timely appealed.

On appeal, the State asks this Court to reverse the district court's orders that granted Adams' motion to suppress and denied the State's motion for reconsideration and to remand the case for further proceedings. In its opening brief on appeal, the State argues that "[b]ecause Adams was lawfully in state custody under the community caretaking function on a mental hold, it was reasonable for police to frisk and then search his pockets prior to transporting him in a police vehicle." Citing *Maryland v. King*, 569 U.S. 435, 447 (2013), the State asserts that in "'some circumstances' a suspicionless search is justified by 'special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like.'" As examples of reasonable searches, the State points to DNA swabbing as part of booking processes, strip searches of inmates, and searches incident to lawful arrest. Then the State claims, citing *Riley v. California*, 573 U.S. 373, 384 (2014), that a search incident to arrest is reasonable even if there is "no concern about the loss of evidence," and "no specific concern" that the arrestee "might be armed" because it is justified by certain governmental needs, such as officer safety. Finally, the State references decisions from the courts of appeals in Washington, Utah, and Oregon. According to the State, these courts have ruled that an officer may search an individual taken into custody under the community caretaking function to ensure the safety of the officer and others.

4

Adams responds that legal authority permitting police officers to search an individual in custody on a mental health hold under the community caretaking doctrine does not exist. Instead, Adams maintains that the district court correctly concluded that the State failed to provide sufficient evidence that Adams was armed and presently dangerous to justify the search under *Terry*. Adams argues that since the State failed to meet its burden to show the warrantless search was lawful under a recognized exception to the warrant requirement, his Fourth Amendment rights were violated.

The State's reply brief on appeal, for the first time, explicitly asserted that this case involved the "special needs" exception to the Fourth Amendment's warrant requirement, where it characterized the matter as "a straightforward application of the special needs exception."

## II.    STANDARDS OF REVIEW

This Court ordinarily applies a bifurcated standard of review when considering a challenge to a district court's decision on a motion to suppress. *State v. Maahs*, 171 Idaho 738, 744, 525 P.3d 1131, 1137 (2023) (citing *State v. Phipps*, 166 Idaho 1, 4, 454 P.3d 1084, 1087 (2019)). "When a decision on a motion to suppress is challenged, the Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *Phipps*, 166 Idaho at 4, 454 P.3d at 1087 (quoting *State v. Mullins*, 164 Idaho 493, 496, 432 P.3d 42, 45 (2018)).

## III.    ANALYSIS

At the outset, we note that Adams does not contest the circumstances of his involuntary commitment under Idaho Code section 66-329. The sole issue before this Court is whether the warrantless search of Adams, who was in civil protective custody under Idaho Code section 66-329, was permissible under the Fourth Amendment of the United States Constitution. The parties' arguments on appeal are based entirely on the United States Constitution, as neither party raised the legality of the search under Article I, section 17 of the Idaho Constitution.

Although an issue of first impression for this Court, the framework for deciding the issue is well established. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons . . . , against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend IV. It applies to the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Mapp v. Ohio*, 367 U.S. 643, 654–55 (1961). It is well established that warrantless searches and seizures "are per se unreasonable under the Fourth Amendment."

5

*Katz v. United States*, 389 U.S. 347, 357 (1967); *see State v. Hollist*, 170 Idaho 556, 561, 513 P.3d 1176, 1181 (2022) (quoting *State v. Rios*, 160 Idaho 262, 265, 371 P.3d 316, 319 (2016)). To overcome the presumption of unreasonableness, the State bears the burden of demonstrating that the search or seizure either fell within one of the well-recognized exceptions to the warrant requirement "or was otherwise reasonable under the circumstances." *State v. Hoskins*, 165 Idaho 217, 221, 443 P.3d 231, 235 (2019) (quoting *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995)). Ever mindful of this presumption, we affirm the trial court's decision to grant Adams' motion to suppress because the State did not demonstrate that the search that occurred in this case either fell within one of the well-recognized exceptions to the Fourth Amendment's warrant requirement or was otherwise reasonable under the circumstances.

## A. Law enforcement's "community caretaking function" is not a standalone exception to the Fourth Amendment's warrant requirement.

To assess the constitutionality of the search, we first consider the State's reliance on the "community caretaking function." The State first contended that the officer's search of Adams was reasonable under the "community caretaking function," arguing that it was conducted for safety reasons before transporting Adams in a police vehicle. In contrast, Adams maintains that the community caretaking doctrine does not independently justify a warrantless search of a person.

The community caretaking doctrine, first recognized by the Supreme Court of the United States in *Cady v. Dombrowski*, permits officers to engage in certain warrantless actions when acting in a non-investigatory capacity to protect public safety. 413 U.S. 433, 441 (1973). Critically, the community caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* The central issue in this case is whether the scope of this doctrine can justify the officer's search of Adams.

The United States Supreme Court recently held that an officer's community caretaking duties do not create "a standalone doctrine that justifies warrantless searches and seizures in the home." *Caniglia v. Strom*, 593 U.S. 194, 196 (2021). *Caniglia* was a civil action alleging a deprivation of rights following officers' response to a welfare check. *Id.* at 196–97. During an argument with his wife, the petitioner placed a handgun on the dining room table and urged her to "shoot [him] now and get it over with." *Id.* at 196 (alteration in original). The next day, unable to reach her husband by phone, she called the police to request a welfare check. *Id.* The petitioner was on the patio when the officers arrived at the couple's home. *Id.* The petitioner agreed to go to the hospital for a psychiatric evaluation on the condition that the officers would not take his

firearms. *Id.* at 196–97. Once he left, the officers searched the home and seized his weapons. *Id.* at 197. The petitioner filed a lawsuit against the city and its police department, claiming that the officers' actions violated the Fourth Amendment. *Id.*

The Supreme Court reviewed the decision of the First Circuit Court of Appeals, which had relied on the "'special role' that police officers play in our society," drawn from *Cady*, to conclude that the officers' removal of the petitioner and his firearms from his home was justified by a "community caretaking exception" to the warrant requirement. *Caniglia v. Strom*, 953 F.3d 112, 124 (1st Cir. 2020), *vacated*, 593 U.S. 194, *remanded to*, 569 F. Supp. 3d 87 (D.R.I. 2021). In a unanimous decision, the Supreme Court rejected the First Circuit's reliance on *Cady* to "extrapolate[] a freestanding community-caretaking exception that applies to both cars and homes." *Caniglia*, 593 U.S. at 197. The Supreme Court explained that "[n]either the holding nor logic of *Cady* justified" the First Circuit's freestanding community-caretaking exception. *Id.* at 198. The Supreme Court vacated the judgment and remanded the case, stating that *Cady*'s "recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." *Id.* at 199.

We agree with the dissent that a police officer's tasks, which are not related to enforcing criminal statutes and fall under the officer's community caretaking role, cover a wide range of circumstances. However, the invocation of the community caretaking function by this Court has been limited, consistent with the holding in *Caniglia*, and generally falls into three categories. As explained in *Cady*, these categories are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. at 441. First, we have held that the "community caretaking function" permits an officer to detain a person when there is a present need for assistance. *See State v. Page*, 140 Idaho 841, 844, 103 P.3d 454, 457 (2004); *State v. Towner*, 169 Idaho 773, 779, 503 P.3d 989, 995 (2022); *Hollist*, 170 Idaho at 561, 513 P.3d at 1181. Second, we have held that the community caretaking function permits an officer to stop a motorist when there is a genuine and warranted concern of a present need for assistance or another public interest justifying the stop. *See, e.g.*, *State v. Van Zanten*, 173 Idaho 620, 625, 546 P.3d 163, 168 (2024) (holding that stopping a commercial vehicle posing a safety threat due to an unsecured hazardous materials bucket was reasonable); *State v. Godwin*, 121 Idaho 491, 495–96, 826 P.2d 452, 456–57 (1992) (holding that briefly detaining a motorist parked near an ongoing

traffic stop to verify identification was reasonable); *but cf. State v. Wixom*, 130 Idaho 752, 754, 947 P.2d 1000, 1002 (1997) (holding that stopping a motorist merely for passing an accident site was unreasonable). Third, we have held that the community caretaking function permits impoundment of a vehicle when the officer's decision to impound the car is reasonable under the circumstances; for example, when the vehicle is parked in a no-parking zone, obstructing traffic, or violating any parking ordinances. *See State v. Smith*, ___ Idaho ___, ___, 569 P.3d 137, 150 (2025) (holding that the State did not meet its burden to show that an officer's decision to impound a vehicle served a community caretaking purpose); *but cf. Weaver*, 127 Idaho at 291–92, 900 P.2d at 199–200 (holding that the impoundment was unreasonable because the licensed driver who was not arrested was present and able to drive the car but the officer did not attempt to discover that information); *see also State v. Ramos*, 172 Idaho 764, 773, 536 P.3d 876, 885 (2023) (explaining that an impoundment is unreasonable when the "primary purpose" is a pretext to investigate criminal suspicions).

Applying these principles, the State's argument that the search of Adams' pocket was permissible under the community caretaking function is inconsistent with *Caniglia*. First, a search of a person arguably represents an even greater intrusion than a search of a home, or at least one that is on equal footing with the search of a home. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986) (stating that "[t]he touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'"); *see also Katz*, 389 U.S. at 351 (1967) (explaining that "the Fourth Amendment protects people, not places"); *Sibron v. New York*, 392 U.S. 40, 65–66 (1968) (holding that a police officer "violate[d] the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions" when he "thrust his hand into [the defendant's] pocket" without first engaging in a *Terry* pat-down). If *Caniglia* prohibits warrantless home searches under the community caretaking doctrine, then it follows that warrantless searches of individuals must meet at least the same constitutional standard. Second, the Supreme Court squarely rejected the notion that non-investigative law enforcement duties—no matter how well-intentioned—create an independent exception to the Fourth Amendment. *See Caniglia*, 593 U.S. at 198–99. As such, the State's reliance on community caretaking as a basis for the search is unpersuasive.

To support its argument, the State cites *State v. Dempsey*, 947 P.2d 265, 268 (Wash. Ct. App. 1997), *abrogated on other grounds by State v. Neeley*, 52 P.3d 539, 542 (Wash. Ct. App.

2002), and similar cases from Utah, Florida, and Oregon, which suggest that officer safety during civil detentions can justify warrantless searches under the community caretaking function. However, these decisions predate *Caniglia* and thus carry limited persuasive authority in the post-*Caniglia* landscape. Even before *Caniglia*, some courts began to limit the scope of the doctrine. For example, in *State v. A.A.*, the Washington Court of Appeals narrowed its earlier position in *Dempsey*, holding that a search must be limited in scope and "strictly relevant" to the caretaking purpose, even in civil custody scenarios. 349 P.3d 909, 913–14 (Wash. Ct. App. 2015). The court of appeals clarified that only where there is "risk of imminent or substantial harm" to the individual or others may a more intrusive search follow an initial weapons pat-down. *See id.* at 916.

Before proceeding, we pause to address this Court's prior decision in *Towner*, where we were asked to address the scope of the community caretaking function in a similar civil protective custody case. 169 Idaho at 780, 503 P.3d at 996. While our caselaw generally aligns with *Caniglia*, we note that in *Towner*, this Court stated, "An officer acting pursuant to his or her 'community caretaking function,' has been recognized as an exception to the Fourth Amendment's warrant requirement." *Id.* at 779, 503 P.3d at 995. That statement, however, is dicta. The decision rested on statutory grounds and did not depend on Fourth Amendment analysis.

In light of *Caniglia*, the officer's search of Adams must have been justified by a recognized exception to the warrant requirement or have been "otherwise reasonable under the circumstances." *Hoskins*, 165 Idaho at 221, 443 P.3d at 235. The community caretaking function, standing alone, cannot justify the warrantless search at issue here.

**B. The State failed to demonstrate that the search either fell within one of the well-recognized exceptions to the warrant requirement or was otherwise reasonable under the circumstances.**

We next examine whether the search was permissible under other well-recognized exceptions to the Fourth Amendment's warrant requirement or if it was otherwise reasonable under the totality of the circumstances.

1. <u>The search does not fall under a well-recognized exception to the Fourth Amendment's warrant requirement.</u>

The State argues that police officers are authorized to conduct a complete search of a patient taken into civil protective custody under Idaho Code section 66-329, similar to that allowed during a search incident to arrest. Adams contends that an involuntary commitment fundamentally differs from a criminal arrest and should not be treated as such.

9

To support its argument that an involuntary commitment is akin to an arrest, the State cites various cases that affirm the constitutionality of warrantless searches during lawful custody, including the DNA swab collected during booking in *Maryland v. King*, 569 U.S. 435, 447 (2013); strip searches of inmates in *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 330–31 (2012); and searches incident to arrest in *Chimel v. California*, 395 U.S. 752, 755 (1969). The State contends that these cases support the position that a police officer may search a person who is lawfully in civil protective custody pursuant to Idaho Code section 66-329 to ensure safety and assess the individual's condition.

The State's argument conflates two distinct exceptions to the warrant requirement: the search incident to arrest exception with the special needs exception. The former applies in criminal contexts involving custodial arrests, where a police officer may search an arrestee because concerns about the officer's safety and preservation of evidence outweigh the arrestee's privacy interest. *Virginia v. Moore*, 553 U.S. 164, 176–77 (2008); *State v. Lee*, 162 Idaho 642, 649–50, 402 P.3d 1095, 1102–03 (2017). The latter applies in non-criminal contexts where a warrant would be impracticable and individualized suspicion unnecessary, provided the search addresses a legitimate government interest "beyond the normal need for law enforcement." *See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 829–30 (2002) (suspicionless drug testing of any public school student involved in an extracurricular activity was permissible, considering the school's custodial responsibility and the student's limited expectation of privacy); *State v. Doe*, 149 Idaho 353, 357–58, 233 P.3d 1275, 1279–80 (2010) (requiring parents of a juvenile to undergo drug testing as a condition of their child's probation was not permissible because the parents were not under the State's oversight and do not share the same diminished expectation of privacy as their child). We address each distinct exception separately.

The State did not explicitly argue that this case falls under the special needs exception before the district court or in its opening brief on appeal. It is unclear what the State argued in its opposition to Adams' motion to suppress below because the opposition and memorandum in support of the opposition are omitted from the record on appeal. At the suppression hearing, the State referenced concerns about officer safety and the safety of individuals who have ingested drugs while being transported in a patrol car. This reference, in our view, is insufficient to raise the special needs doctrine. It is a general discussion focused on officer safety and does not invoke the special needs doctrine.

We have frequently stated that we will not consider issues on appeal that were not raised before the trial court. *State v. Wilson*, 169 Idaho 342, 345, 495 P.3d 1030, 1033 (2021) (citing *Hoskins*, 165 Idaho at 221, 443 P.3d at 235). In *Wilson*, we recently clarified that "[r]efined issues on appeal are acceptable 'so long as the substantive issue and the party's position on that issue remain the same.'" *Id.* (emphasis omitted) (quoting *Siercke v. Siercke*, 167 Idaho 709, 715–16, 476 P.3d 376, 382–83 (2020)). This Court can address refined legal arguments regarding issues previously heard and decided below, "but in fairness to the district court and the opposing party, we cannot usurp the district court's role by deciding new legal issues in the first instance." *Id.* (quoting *Siercke*, 165 Idaho at 716, 476 P.3d at 383). Although the State referred to safety concerns below, as discussed next, the State's special needs theory, to the extent it was raised, is both procedurally and substantively deficient.

On appeal, in its opening brief, the State generally claimed that in some circumstances, "special law enforcement needs, diminished expectations of privacy, [or] minimal intrusions" may justify a warrantless, suspicionless search. The State again pointed to officer and public safety as a justification for the search in this case. However, the State did not assert that this case involved the "special needs" exception until its reply brief, where it characterized the matter as "a straightforward application of the special needs exception." In addition, during oral argument, the State advocated for the protection of the mental health facilities—an argument not raised before the district court or presented in the State's appellate briefs.

This Court has consistently held that we "will not consider arguments raised for the first time in the appellant's reply brief." *State v. Kimbley*, 173 Idaho 149, 157, 539 P.3d 969, 977 (2023) (quoting *Suitts v. Nix*, 141 Idaho 706, 708, 117 P.3d 120, 122 (2005)). A reviewing court only considers "the initial brief on appeal for the issues presented because those are the arguments and authority to which the respondent has an opportunity to respond in the respondent's brief." *Id.* (quoting *Suitts*, 141 Idaho at 708, 117 P.3d at 122). Accordingly, any new theory or legal rationale first presented in a reply brief is not properly before this Court on appeal.

Moreover, in addition to raising the argument belatedly, the State did not support its invocation of the special needs exception with argument and legal authority. Specifically, it did not articulate the two-step, context-specific inquiry necessary to weigh the privacy interests at stake against the intrusiveness of the search in relation to the government's legitimate interests. *See Doe*, 149 Idaho at 357–59, 233 P.3d at 1279–81 (citing *Earls*, 536 U.S. at 830, 832) (explaining

that the first step involves assessing the weight and nature of the individual's privacy interest, while the second step examines the intrusiveness of the search). Thus, even if the Court were to consider the argument despite its late presentation, as this Court has explained, an argument is waived if it is "not supported by any cogent argument or authority" in the opening brief. *Liponis v. Bach*, 149 Idaho 372, 374, 234 P.3d 696, 698 (2010).

While the State made arguments about public and officer safety to justify the search of Adams' pocket, these generalized safety concerns by themselves, were insufficient to invoke the special needs exception. Absent was any evidence to support a special needs exception analysis either before the district court or on appeal. Without evidence about the dangers or safety concerns particular to an individual or others surrounding an involuntary commitment, along with evidence concerning the privacy interests at stake, the State presented nothing more than generalized safety concerns that exist under any scenario in which a person possesses controlled substances. Simply put, while the State is not foreclosed in a future case from arguing that the special needs exception justified a warrantless search, it did not present sufficient evidence, and it did not present cogent argument and authority sufficient to invoke the exception in this case. For these reasons, to the extent that the State asks us to apply aspects of the special needs exception here, we decline to do so.

Next, the State argues that a search incident to involuntary custody is permissible just as a search incident to arrest is permitted. The State maintains that a search arising from involuntary custody is not limited to a *Terry* frisk. It emphasizes that the touchstone of the Fourth Amendment is reasonableness and that a full search (akin to a search incident to a lawful arrest) for involuntary commitment is reasonable because of the substantial risk that the individual could attempt to harm the officers or himself or herself, including with objects or items that are not typically used as weapons (e.g., pens or medication).

Idaho Code section 66-329 explains the judicial procedure for having someone involuntarily committed for mental health treatment. *See* I.C. § 66-329. Before the State may involuntarily commit a person, section 66-329 requires a judicial determination that the "proposed patient is mentally ill and either likely to injure himself or others or is gravely disabled due to mental illness[.]" I.C. § 66-329(5). Idaho law directs that patients subject to protective civil custody should not be treated as criminals. *See id.* ("Under no circumstances shall the proposed patient be detained in a nonmedical unit used for the detention of individuals charged with or

convicted of penal offenses."). Moreover, Idaho Code section 66-346 outlines patient rights, including the right to communicate freely, receive visitors, wear personal clothing, keep personal belongings, have individual storage, manage spending money, meet with their attorney, and refuse specific treatments. I.C. § 66-346(a). These rights are so highly safeguarded that any individual who violates them may face misdemeanor criminal prosecution and penalties, including fines and imprisonment for up to one year. I.C. § 66-349.

Unlike criminal arrestees who are taken into custody based on probable cause of unlawful conduct, individuals subject to civil commitment have not been charged with a crime, nor are they facing punitive sanctions. *Compare* I.C. § 19-603 (providing when a peace officer may arrest), *with* I.C. §§ 66-317 to 66-356 (providing hospitalization for the mentally ill). A civil commitment under Idaho Code section 66-329 is therapeutic rather than punitive and is designed to facilitate treatment and care rather than impose discipline or prevent criminal behavior. *See id.* Idaho's civil commitment statutes make clear that an individual taken into protective civil custody should not be treated in the same manner as a person placed under arrest for criminal activities. Still, Idaho Code section 66-329 does not specify how, when, or to what extent patient searches may be conducted.

In support of its position, the State turns to decisions from other jurisdictions, specifically Washington, Utah, and Oregon, which have addressed searches incident to civil detention. The State cites *State v. Collins*, 53 P.3d 953, 954–56 (Utah Ct. App. 2002), where the Utah Court of Appeals upheld a search that was conducted before placing an individual, who exhibited erratic, aggressive, and threatening behavior, into protective custody. The Utah Court of Appeals determined that Utah's civil commitment statute implicitly authorized searches, not limited to weapons pat-downs, during protective custody to ensure safety of the individual, law enforcement, and others. *Id.* at 956–57.

The State also relies on *State v. Marsh*, 462 P.2d 459 (Or. Ct. App. 1969) (en banc), to argue that law enforcement may search for objects, including pills or other medications when those objects appear reasonably related to diagnosing or treating the individual's apparent mental or physical condition. However, the defendant in *Marsh* conceded that the search of his person was proper pursuant to Oregon's civil commitment statute. *Id.* at 460. The issue in *Marsh* was not the permissibility of the search itself but whether officers were justified in seizing marijuana observed in plain view during that search for the purpose of criminal prosecution. *Id.* Ultimately, the Oregon

Court of Appeals upheld the conviction. *Id.* at 461. However, the Oregon Supreme Court has since clarified that individuals subject to other civil holds retain a greater expectation of privacy than individuals in the criminal context. *See, e.g.*, *State v. Perry*, 688 P.2d 827, 831 (Or. 1984) (en banc) (warrantless search of detained person's luggage during detoxification held improper); *State v. Newman*, 637 P.2d 143, 146 (Or. 1981) (en banc) (warrantless search of a purse in noncriminal, non-emergency situation held "not reasonable").

We agree with Adams that these cases are distinguishable. In *Marsh*, *Collins*, and *Dempsey*, courts relied on expressed or implied statutory authority to search under the respective states' civil commitment laws, which require a determination or belief that the individual poses a danger to themselves or others. *See Dempsey*, 947 P.2d at 268; *Collins*, 53 P.3d at 957; *Marsh*, 462 P.2d at 461. This rationale cannot be applied in this case because our commitment statute, Idaho Code section 66-239, outlines two distinct circumstances under which a patient may be subjected to an involuntary commitment. The record does not reflect the circumstances underlying Adams' commitment. It is unclear whether he was involuntarily committed due to being "likely to injure himself or others" or due to being "gravely disabled due to of mental illness." I.C. § 66-329(11)(b). This distinction is crucial. A finding of "likely to injure himself or others" requires a determination that a "substantial risk" of "physical harm" to the patient or others exists. *See* I.C. § 66-317(10). In contrast, a finding of "grave disability" based on mental illness does not, by itself, establish a substantial risk of harm to self or others. *See* I.C. § 66-317(12). Without such a finding, the justification for a warrantless search under the civil commitment statute is significantly weakened.

Adams argues that he does not have the same diminished expectation of privacy as a criminally arrested individual due to the differences between criminal arrests and civil commitments. We agree. The nature of a commitment under Idaho Code section 66-329 is not analogous to an arrest. Courts in other states have come to the same conclusion regarding similar civil-commitment statutes. *See, e.g.*, *Lindsey v. State*, 639 S.E.2d 584, 646–47 (Ga. Ct. App. 2006) (explaining that "the inventory process in noncriminal, nonemergency cases should be less intrusive than that considered reasonable in criminal cases"); *State v. Lawrence*, 648 P.2d 1332, 1336 (Or. Ct. App. 1982) (explaining that "it would be anomalous to treat" a person taken into protective civil custody for detoxification "the same as one in full custody arrest for a criminal offense" because "[w]hat is reasonable in the latter case may not be in the former"); *Cordell v. Weber*, 673 N.W.2d 49, 56 (S.D. 2003) (explaining that "a civil detainee (as compared to a person

14

under arrest) has a higher level of expectation of privacy in their personal items for purposes of Fourth Amendment analysis"). Therefore, the searches incident to arrest exception does not apply in this situation.

In summary, the State has not established that the search falls within a well-recognized exception to the Fourth Amendment's warrant requirement.

2. The search is not otherwise reasonable under the totality of the circumstances.

Having determined that the search did not fall within a recognized exception to the Fourth Amendment's warrant requirement, we next examine whether the warrantless search was nonetheless reasonable.

The civil commitment statute contemplates the transportation of patients to different locations. *See* I.C. § 66-329(12) ("The commitment order constitutes a continuing authorization for . . . law enforcement . . . to transport a committed patient to designated outpatient treatment[.]"). Although we understand there is a legitimate concern for officer safety, we are aware of no case that stands for the proposition that officers can search an individual simply because the individual is being placed in a police vehicle. *See Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (acknowledging the concern for officer safety justifies the minimal intrusion of ordering the driver and passengers out of the car during a speeding stop but stating greater intrusion of full field-type search is not justified). On the contrary, caselaw consistently indicates that the officer must have a reasonable belief that his safety is in danger and must first perform a pat-down. *See Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (explaining that officers may conduct a pat-down search for their own protection and safety to search for weapons they reasonably believe or suspect are then in the possession of the individual they have detained).

Adams asserts that the district court properly relied on *State v. Fairchild*, 164 Idaho 336, 429 P.3d 877 (Ct. App 2018), to conclude the search in this case was not justified based on *Terry*. The criminal law relating to searches, seizures, and arrests provides a useful analogy to the validity of searches incident to civil commitments, but there is an important difference between criminal arrests and civil commitments, and as a result, the laws of the former do not always apply to the latter. *See State v. Lowrimore*, 841 P.2d 779, 782 (Wash. Ct. App. 1992); *State v. Klase*, 131 N.E.3d 1054, 1063 (Ohio Ct. App. 2019) (citation omitted).

Instead, we consider caselaw evaluating similar scenarios involving non-criminal custody. A case from Florida that addresses search standards within the context of civil protective

detentions is compelling and factually analogous. In *R.A.S. v. State*, police detained R.A.S., a juvenile, because he had been reported absent from school. 141 So.3d 687, 689 (Fla. Dist. Ct. App. 2014). When the police officer found the juvenile, he offered the juvenile a ride to school, which was accepted. *Id.* The police officer then asked the juvenile to empty his pockets before entering the patrol car. *Id.* The juvenile emptied all but one pocket. *Id.* The officer asked if he could "do a weapons pat-down," and the juvenile agreed. *Id.* While patting a back pocket, the officer "felt a small 'squishy bulge.'" *Id.* He asked what the packet contained, and the juvenile removed a baggie containing marijuana. *Id.*

The *R.A.S.* court held that the search was illegal, stating that "an officer may conduct a pat-down for weapons before placing a truant in his vehicle, but he is not authorized to conduct a full search." *Id.* The court noted that the detention of a truant was authorized under Florida law but emphasized that "truancy is not a crime, and a custodial detention for this purpose is not an arrest." *Id.* Because this was not a search incident to arrest, the court held that the officer, at most, was authorized to conduct a pat-down search for weapons before placing the juvenile in his patrol car. *Id.* at 690. The court also held that once the officer performed the pat-down search and determined that the juvenile was not carrying a weapon or contraband, the officer had no legal basis to continue the search. *Id.* The court reasoned:

> [W]hen taking a truant into custody, the only concern is for officer safety—no crime has been committed and, accordingly, there is no need to preserve evidence of a crime. The deputy here knew that the "squishy object" in [the juvenile]'s pocket was not a weapon. Therefore, he had no legal basis for questioning [the juvenile] further about the contents of the pocket.

*Id.* We agree with the Florida court's analysis in *R.A.S.*, which balanced safety with constitutional protections. We hold that, for the safety of police officers and others, a limited pat-down search for weapons before placing a patient subject to civil custody under Idaho Code section 66-329 in a patrol car and transporting that patient to the hospital is reasonable.

However, in this case, the officer exceeded the permissible scope of the pat-down when he reached inside Adams' pocket. Like the officer in *R.A.S.* who felt a "small squishy bulge," Officer Christensen testified that the item in Adams' pocket felt like a "wadded up piece of whatever." He further stated that the item did not feel like a weapon. A "wadded up piece of whatever" did not justify searching *inside* the pocket because the officer did not testify that the item he felt resembled a weapon in shape, density, or size. There was no testimony that the object felt sharp, solid, or heavy—attributes typically associated with weapons like knives or firearms. Despite this, the

officer reached into Adams' pocket and seized the item based on his suspicion that it was drug related. The circumstances did not justify the interior search of Adams' pocket. Once the officer conducted the pat-down and determined that Adams did not have a weapon, the search should have stopped. Adams did not exhibit signs of danger to himself or others. The district court found that Adams "was completely cooperative" and complied "with every request" the officers made. The only concern was for officer safety. Thus, while the frisk was initially reasonable, Officer Christensen exceeded the permissible scope of the search when he reached inside Adams' pocket. Because the officer's actions shifted from a safety frisk to an unjustified full-pocket search for evidence, his search of Adams' pocket was unreasonable.

We recognize that the interplay between mental illness and illicit drug use is complex, and logic suggests that introducing illicit drugs into a mental health facility is counterproductive and dangerous for the individual with the drugs and for others. The State, however, while advocating for a full search incident to civil detention, failed to support its position with an evidentiary basis. There was no evidence in this case concerning the civil detention emanating from the Lincoln County case, no evidence of Adams' classification by a court as likely to injure himself or others, gravely disabled, or both. The State introduced no evidence from St. Luke's or other medical facilities about their protocols, if any, for searching mental health patients for illicit substances, or the dangers of introducing drugs into mental health facilities. We hold that the State did not demonstrate that the search of Adams' pocket either fell within one of the well-recognized exceptions to the Fourth Amendment warrant requirement or was otherwise reasonable under the circumstances. In short, the State failed to support its position, and the district court did not err in suppressing the evidence.

## IV. CONCLUSION

We affirm the district court's order granting Adams' motion to suppress.

Justices BRODY and ZAHN CONCUR.


**BEVAN, C.J., dissenting.**

I respectfully dissent from the majority decision reached today. While I join in the conclusion that appropriately clarifies that there is no "community caretaking exception" to the Fourth Amendment's warrant requirement, and that this Court, as well as a myriad of others have mistakenly referred to such an "exception" in the past, I would reverse the district court's decision

and hold that Officer Christensen's actions in searching Adams were *reasonable* under the circumstances—and thus not violative of the Fourth Amendment. *See Cady v. Dombrowski*, 413 U.S. 433 (1973).

It is beyond dispute that "[t]he Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *State v. Wharton*, 170 Idaho 329, 332, 510 P.3d 682, 685 (2022) (quoting U.S. CONST. amend. IV). This guarantee was made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). But the "Fourth Amendment protects people, not places, and forbids not all searches and seizures, but '*unreasonable*' searches and seizures." *Wharton*, 170 Idaho at 332, 510 P.3d at 685 (emphasis added) (quoting *State v. Hobson*, 95 Idaho 920, 924, 523 P.2d 523, 527 (1974)). Thus, while warrantless searches are presumptively unreasonable, *State v. Hollist*, 170 Idaho 556, 561, 513 P.3d 1176, 1181 (2022), such presumption may be overcome by showing "that the search either [(1)] falls within a well-recognized exception to the warrant requirement or [(2)] was reasonable under the circumstances." *State v. Hoskins*, 165 Idaho 217, 221, 443 P.3d 231, 235 (2019) (quoting *State v. Weaver*, 127 Idaho 21288, 290, 900 P.2d 196, 198 (1995)).

Over time, "community caretaking" began to be described as an *exception* to the warrant requirement. *See, e.g.*, *State v. Towner*, 169 Idaho 773, 779, 503 P.3d 989, 995 (2022); *Taylor v. City of Saginaw*, 922 F.3d 328, 334–35 (6th Cir. 2019); *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014); *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020); *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012). While the Court has corrected that notion today, I believe that "community caretaking" still remains a viable paradigm through which the *reasonableness* of officer behavior can be evaluated under the facts of each community caretaking case.

The community caretaking doctrine has its roots in *Cady v. Dombrowski*, 413 U.S. 433 (1973). There, the defendant's vehicle was left on the side of the road following an accident and the defendant was arrested for drunk driving. *Id.* at 435–36. Officers reasonably believed that the damaged vehicle posed a nuisance, and that the defendant possibly left a revolver in the vehicle, so they searched the trunk of his car without a warrant pursuant to standard procedure. *Id.* at 437. During the search additional evidence linking Dombrowski to a homicide was located.

The Supreme Court upheld the validity of the search, not as an exception to the warrant requirement, but as being reasonable under the circumstances:

> We [have] made it clear . . . that whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case . . . .
>
> ….
>
> Here the the [sic] justification [for the search], while different [than in other automobile search cases], was as immediate and constitutionally *reasonable* as [in those cases]: concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle. . . . The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search *unreasonable*.

*Dombrowski*, 413 U.S. at 440, 447 (emphasis added).

Thus, the Supreme Court recognized that police officers may *reasonably* engage in "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. The Court held that the search was *reasonable*, even with no warrant, because it was to "protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." *Id.* at 443. Again, this conclusion was not rooted in an "exception" to the Fourth Amendment's warrant requirement, but in the *reasonableness* of officers' behavior that was "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id*. at 441.

This conclusion is consistent with the analysis of Justice Alito, who recently concurred in a case involving police officers' seizure of Mr. Caniglia and his firearms—taking them from his home under the guise of a community caretaking function. *See Caniglia v. Strom*, 593 U.S. 194 (2021) (holding that police officers' community caretaking duties do not justify warrantless searches and seizures in the home). Justice Alito recognized that "there is no special Fourth Amendment rule for a broad category of cases involving 'community caretaking.'" *Caniglia*, 593 U.S. at 200 (Alito, J., concurring). That said, Justice Alito then recognized:

> As I understand the term, it describes the many police tasks that go beyond criminal law enforcement. These tasks vary widely, and there is no clear limit on how far they might extend in the future. The category potentially includes any non-law-enforcement work that a community chooses to assign, and because of the breadth of activities that may be described as community caretaking, we should not assume that the Fourth Amendment's command of reasonableness applies in the same way to everything that might be viewed as falling into this broad category.

*Id*.

19

I wholeheartedly agree with this sentiment. Rather than boxing "community caretaking" functions into three limited categories as the majority does here, we should recognize "that the Fourth Amendment's command of reasonableness applies in the same way to everything that might be viewed as falling into this broad category [of community caretaking]." *Id*. Because community caretaking tasks vary, "we should not assume that the Fourth Amendment's command of reasonableness applies in the same way to everything that might be viewed as falling into this broad category." *Id*. Thus, I believe the majority errs by limiting community caretaking to three[1] groupings of tasks announced in the majority opinion.

I acknowledge that officers' actions in these three categories of cases certainly make up a subset of the greater whole recognized as "community caretaking." But I would not limit the community caretaking tasks of police officers as the majority has here. As Justice Alito recognized, "[t]hese tasks [beyond criminal law enforcement] vary widely, and there is no clear limit on how far they might extend in the future." *Id*.

Thus, it is impossible to compartmentalize the various tasks of police officers that fall within the type of circumstances identified by the United States Supreme Court as "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute[ ]" into three neat slots. *Dombrowski*, 413 U.S. at 441. Community caretaking includes being summoned by hospital personnel to help transport a recently belligerent mental health patient to a psychiatric hospital. This is not a task of *criminal law enforcement*, but is a task wholly divorced therefrom, assigned to officers to help facilitate execution of a court order to restore or evaluate Adams' mental health.

Community caretaking could include, but not be limited to: rendering first aid to one who has overdosed on drugs, *see State v. Eldridge*, 237 A.3d 266, 278 (N.H. 2020); checking on the welfare of a person, *State v. Teulilo*, 530 P.3d 195, 201 (Wash. 2023); offering a truant student a ride, *R.A.S. v. Florida*, 141 So.3d 687, 689 (Fla. Dist. Ct. App. 2014); or "enter[ing] a home without a warrant when [officers] have an objectively reasonable basis for believing that an

---

[1] The majority declares that "the invocation of the community caretaking function by this Court has been limited, consistent with the holding in *Caniglia*, and generally falls into three categories." *Ante* at 5. First, officers may detain an individual if there is a "present need for assistance." *State v. Page*, 140 Idaho 841, 844, 103 P.3d 454, 457 (2004); *Towner*, 169 Idaho at 779, 503 P.3d at 995. Second, officers may stop a motorist when the officer has a genuine and warranted concern that the motorist needs assistance, or other public interest justifies the stop. *State v. Van Zanten*, 173 Idaho 620, 625, 546 P.3d 163, 168 (2024). Third, the community caretaking function permits impoundment of a vehicle when the officer's decision to impound the car is reasonable under the circumstances. *State v. Van Zanten*, 173 Idaho 620, 625, 546 P.3d 163, 168 (2024).

occupant is seriously injured or imminently threatened with such injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 400 (2006).

So, in my view, the community caretaking efforts of officers would include, at bottom, any tasks unrelated to enforcing criminal statutes which are undertaken in an effort to render aid— even if those tasks ultimately lead to the discovery of evidence of a crime. Thus, the specific community caretaking task the officer performs supplies the footing for analyzing whether a search commenced as part of that function violates the *reasonableness* clause of the Fourth Amendment. What may be reasonable when an officer performs a welfare check might be quite different than when an officer responds to someone potentially suffering from an overdose. *See Towner*, 169 Idaho 773, 503 P.3d 989 (2022). Each circumstance calls for an individualized, case-by-case review of the test we repeatedly cite in warrantless search cases: "The State bears the burden to show that a warrantless search either [1] fell within one of the[ ] well-recognized exceptions to the warrant requirement or [2] *was otherwise reasonable under the circumstances.*" *State v. Smith*, 168 Idaho 463, 472, 483 P.3d 1006, 1015 (2021) (emphasis added). As we have held before, this review requires consideration of the totality of the circumstances. *State v. Wixom*, 130 Idaho 752, 754, 947 P.2d 1000, 1002 (1997); *see also Dombrowski*, 413 U.S. at 440 ("whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case . . . .").

Furthermore, the majority errs by concluding the Fourth Amendment provides greater protections to persons than homes. When it comes to the Fourth Amendment, "the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) (quoting *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring)). The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Smith*, 168 Idaho at 471, 483 P.3d at 1014. In contrast, a police officer may conduct a *Terry* frisk for weapons if he has "reasonable suspicion that a suspect 'is armed and presently dangerous to the officer or to others.'" *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)). Reasonable suspicion is "less demanding than probable cause, which itself is not a high bar . . . ." *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022) (citation modified). It is axiomatic that searching a home is far

more intrusive than a pat-down search of a person, particularly one who is subject to court-ordered detention.

Thus, considering the facts here, I would hold that Officer Christensen's actions were reasonable under the circumstances. Officer Christensen patted down Adams before placing him in the back seat of his patrol car for transport. Importantly, the search was not undertaken as part of a criminal investigation. Therefore, an exterior pat down to feel for weapons before an officer places someone already in protective custody into their car for transport—who has been involuntarily committed for mental health treatment and is being transferred from one hospital to another pursuant to a civil court order—is *reasonable* and requires no exception to the Fourth Amendment. Officers have a legitimate non-investigatory interest in ensuring the person they are transporting does not possess a weapon. The potential danger to the officer and others in moving a mentally unstable person from one facility to another should be self-evident. This is especially true in the involuntary commitment context, regardless of whether the person subject to a detention order has been labeled "gravely disabled" or "likely to injure himself or others." I.C. § 66-317(12), (10).

And, like the officers searching Dombrowski's trunk for a firearm, but finding bloody towels and other evidence of a homicide, *see Dombrowski*, 413 U.S. at 437, I would hold that Officer Christensen's search, that ultimately lead to the seizure of illegal drugs, was a reasonable result of the search. An exterior pat down to feel for weapons is a minor invasion of the individual's Fourth Amendment interests in these limited circumstances. *See Terry*, 392 U.S. 1 (1988). Once the officer feels potential illegal drugs in Adams' pocket, he is justified in seizing those drugs without violating the Fourth Amendment; an officer's conduct in retrieving the drugs is reasonable as a matter of public safety. *See State v. Van Zanten*, 173 Idaho 620, 625, 546 P.3d 163, 168 (2024) ("Addressing public safety concerns is a bedrock of the community caretaking doctrine . . . ."). As the United States Supreme Court reasoned in *Dombrowski*: "Here the justification [for the warrantless search of the automobile] was as immediate and constitutionally reasonable as those in [other vehicle search cases]: concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Dombrowski,* 413 U.S. at 447. Similarly, the concern for police officers or the public being exposed to a mentally troubled individual possessing drugs, and/or the fear of that individual bringing illegal drugs with

him into a mental hospital makes the seizure of the drugs here, likewise "constitutionally reasonable."

Finally, lest there be a question about the State's lack of preservation of this question for appeal, I recognize neither the prosecutor below, nor the State's counsel on appeal uttered the magic words "the special needs exception" before the district court or in its opening brief on appeal. I have not used those words either. Nevertheless, the State argued below and before this Court in its opening brief that the touchstone of the Fourth Amendment in these circumstances is the reasonableness of the officer's conduct—even if at times using the now-incorrect wording of the "community caretaking exception." I have laid out my reasoning for why the community caretaking rubric applies here and thus the issue is appropriately before this Court and warrants a decision reversing the district court.

I thus dissent.

Justice MOELLER CONCURS.