# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 46145

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Boise, June 2019 Term |
| | ) | |
| v. | ) | Opinion filed: December 20, 2019 |
| | ) | |
| KARI JANAE PHIPPS, | ) | Karel A. Lehrman, Clerk |
| | ) | |
| Defendant-Respondent. | ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Richard S. Christensen, District Judge. Clark A. Peterson, Magistrate Judge.

The order of the district court is <u>reversed</u> and the case is <u>remanded</u>.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Appellant. Kenneth K. Jorgensen argued.

Kootenai County Public Defender's Office, Coeur d'Alene, for Respondent. Tyler R. Naftz argued.

_____

MOELLER, Justice.

The State appeals from the Kootenai County district court's reversal of the magistrate court's order denying Kari Janae Phipps's motion to suppress. Phipps asserted below that the statements she made while detained during a routine parole search of a parolee's residence, along with the evidence found as a result of her statements, were inadmissible on Fourth Amendment grounds. The State brings this appeal seeking to delineate the authority of parole officers to detain a non-parolee while performing a routine parole search of a parolee's residence. For the reasons stated below, we reverse the district court's decision and hold that the limited detention of Phipps was reasonable.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 2016, Officer Kuebler and Officer Johnson from the Idaho Department of Correction performed a routine residence check on parolee Terry Wilson. Upon their arrival,

1

the officers knocked on the apartment door and Wilson answered. As the officers entered, they noticed Phipps exit from a back bedroom. The officers recognized Phipps from previous visits. The officers asked Phipps and Wilson to take a seat in the living room while they "cleared the bedrooms for other persons." Officer Johnson testified that, although Phipps never asked to leave at that time, she was not "cleared to leave. . . . [b]ecause of procedure."

After ensuring there was no one else in the apartment, Officer Kuebler advised Phipps and Wilson that a drug dog would be brought in to aid in the search of the residence and asked whether there was anything in the apartment that they should know about. Phipps confessed to having a methamphetamine pipe in her backpack, which was on her person. Officer Kuebler proceeded to conduct a full search of the residence and found two safes containing drugs underneath a bed in a back bedroom. The officers called backup law enforcement to handle the drugs. At some point prior to the arrival of backup, the officers ascertained that Phipps had no outstanding warrants.[1]

Approximately ten to twenty minutes later, Officer Hutchison from the Coeur d'Alene Police Department arrived. Officer Hutchison talked with Phipps separately in a back bedroom after he read Phipps her *Miranda* rights. When asked whether she had a methamphetamine pipe in her backpack, Phipps confirmed that she did. Officer Hutchison searched Phipps's backpack and found the methamphetamine pipe. Consequently, Officer Hutchison issued Phipps a citation for possession of drug paraphernalia.

On January 12, 2017, Phipps moved to suppress the methamphetamine pipe and her statements regarding the pipe. At the suppression hearing, Officer Kuebler was asked why he detained Phipps, to which he explained, "[w]hen we enter a residence, we require that everybody stays in the living room until we clear the residence for officer-safety reasons." Officer Kuebler further explained,

> [W]e're entering a residence where people are on felony probation, and the people
> that necessarily hang out there, a lot of times we find felony warrants or other
> drugs so we -- we don't want to have individuals leaving, coming back --

---

[1] The officers' testimony regarding the timeline of events differs in several respects, resulting in a different recitation of the facts between the magistrate court and the district court. Nevertheless, we adopt the findings of the magistrate court where, as here, they are supported by substantial and competent evidence. *See Pelayo v. Pelayo*, 154 Idaho 855, 858, 303 P.3d 214, 217 (2013) ("The Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings." (quoting *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012))).

knowing where we're at in the residence, coming back with intentions to harm an officer.

Officer Johnson similarly testified that the detention was "[d]epartment procedure to ensure officer safety."

When asked whether there was any suspicion of wrongdoing prior to the search of the residence, Officer Kuebler testified that they did not believe the parolee violated any terms or conditions of his parole; that they did not suspect he had any drugs in his apartment; and that they did not suspect he was illegally possessing a firearm. As for Phipps, Officer Johnson testified that he did not believe Phipps was violating any law at the time. The magistrate court found this to be the case as well: "She didn't appear to be armed or dangerous. They didn't see anything about her person that would justify a *Terry* stop or search of her person." Therefore, the court found that, prior to Phipps's statement to the parole officers regarding the methamphetamine pipe, "there [was] no individual probable cause to hold or detain Ms. Phipps." Rather, "Ms. Phipps was simply a person merely present during a p[arole search] . . . to check a residence."

After the suppression hearing, the magistrate court orally pronounced its findings of fact and conclusions of law. After analyzing cases from the U.S. Supreme Court and Ninth Circuit Court of Appeals, the court concluded that there is no legal difference between a search pursuant to a search warrant and a search pursuant to a parole waiver; in either case, law enforcement may detain all individuals found on the premises. Therefore, the court held that when parole officers are conducting a lawful parole search, they may detain and question all persons present, regardless of whether they have reasonable suspicion or probable cause, which is what the officers did in this case. Accordingly, the magistrate court denied Phipps's motion to suppress.[2]

On March 27, 2017, Phipps entered a conditional guilty plea, reserving the right to appeal the magistrate court's denial of her motion to suppress. On May 5, 2017, Phipps appealed the magistrate court's denial of her motion to suppress to the district court.

On appeal, the district court reversed the magistrate court's denial of Phipps's motion to suppress. The court held that parole officers may not detain non-residents found on the premises during a lawful parole search unless the officers have probable cause or reasonable suspicion. The court explained that "[i]n the case of a valid search warrant, . . . the probable cause

---

[2] The magistrate court initially held that officers may detain all persons, but then elaborated that officers may detain them in order to "determine if this is in fact [their] residence prior to the determination of any criminal activity."

3

determination provides a nexus between an individual's presence at the location and the suspected criminal activity, rendering detention of individuals present reasonable." However, that same nexus "does not exist when law enforcement arrives at a parolee's residence to perform a routine search pursuant to standard conditions of parole" and the individuals "are not parolees nor residents of the home but are merely present at a parolee's residence when law enforcement arrives." Accordingly, the district court held that Phipps was unlawfully seized and suppressed the evidence of the methamphetamine pipe and the statement regarding the pipe under the exclusionary rule. The State timely appealed.

## II.     STANDARD OF REVIEW

"On appeal of a decision rendered by the district court while acting in its intermediate appellate capacity, this Court directly reviews the district court's decision." *State v. Chernobieff*, 161 Idaho 537, 539, 387 P.3d 790, 792 (2016) (quoting *In re Doe*, 147 Idaho 243, 248, 207 P.3d 974, 979 (2009)).

> [T]he Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.

*Pelayo v. Pelayo*, 154 Idaho 855, 858, 303 P.3d 214, 217 (2013) (quoting *Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012)). "Thus, this Court does not review the decision of the magistrate court." *Id.* at 859, 303 P.3d at 218. "Rather, we are 'procedurally bound to affirm or reverse the decisions of the district court.' " *Id.* (quoting *Bailey*, 153 Idaho at 529, 284 P.3d at 973).

"The standard of review of a suppression motion is bifurcated." *State v. Mullins*, 164 Idaho 493, 496, 432 P.3d 42, 45 (2018) (quoting *State v. Watts*, 142 Idaho 230, 232, 127 P.3d 133, 135 (2005)). "When a decision on a motion to suppress is challenged, the Court accepts the trial court's findings of fact that are supported by substantial evidence, but freely reviews the application of constitutional principles to the facts as found." *Id.* (quoting *State v. McNeely*, 162 Idaho 413, 414–15, 398 P.3d 146, 147–48 (2017)).

## III.     ANALYSIS

The State asks this Court to reverse the district court's decision, which reversed the magistrate court's denial of Phipps's motion to suppress. The State contends that it is reasonable

4

for officers conducting a parole search of a parolee's residence to detain third parties on the premises because the government's interest in conducting the parole search outweighs the burden caused to any third parties during the limited detention. The State relies on the U.S. Supreme Court's decision in *Michigan v. Summers*, 452 U.S. 692 (1981) to support its position. Phipps contends that the government's interests do not outweigh the detention when the detainee is a non-resident.

In assessing the validity of Phipps's detention, we initially note three undisputed facts essential to defining the scope of this Court's analysis. First, there is no dispute concerning the officers' authority to enter and search the apartment. The parolee consented to suspicionless searches of his person and residence as a condition of his parole. Second, Phipps's initial detention qualifies as a seizure for purposes of the Fourth Amendment. The State does not contend otherwise and the record shows that Phipps was not free to leave the residence. Third, the officers conceded that they did not have reasonable suspicion or probable cause to initially detain Phipps. Once again, the State does not contend otherwise and the record shows that neither officer believed Phipps to be armed or dangerous or involved in any wrongdoing. Therefore, the dispute now before this Court involves only the constitutionality of a suspicionless detention of a third party during a routine parole search. This is an issue of first impression for this Court.

"The Fourth Amendment to the United States Constitution protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " *State v. Bishop*, 146 Idaho 804, 810, 203 P.3d 1203, 1209 (2009) (quoting U.S. CONST. amend. IV). "Like the Fourth Amendment, the purpose of Art. I, § 17 [of the Idaho Constitution] is to protect Idaho citizens' reasonable expectation of privacy against arbitrary governmental intrusion." *State v. Albertson*, 165 Idaho 126, ___, 443 P.3d 140, 143 (2019) (quoting *State v. Christensen*, 131 Idaho 143, 146, 953 P.2d 583, 586 (1998)). Thus, the reasonable expectation of privacy inherent within the Fourth Amendment has not only been incorporated under the Due Process Clause of the Fourteenth Amendment to apply to the states, *see Mapp v. Ohio*, 367 U.S. 643 (1961), but it has also been recognized within the Idaho Constitution.[3]

---

[3] Although Phipps argued in her motion to suppress and briefing below that Art. I, § 17 of the Idaho Constitution affords her greater protection than that provided under the Fourth Amendment to the U.S. Constitution, *see State v.*

Generally, in order to be reasonable under the Fourth Amendment, "an official seizure of the person must be supported by probable cause, even if no formal arrest is made." *Summers*, 452 U.S. at 696 (citing *Dunaway v. New York*, 442 U.S. 200, 204 (1979)). However, the U.S. Supreme Court has recognized that "some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment." *Id.* at 697 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975); *Adams v. Williams*, 407 U.S. 143 (1972); *Terry v. Ohio*, 392 U.S. 1 (1968)). "In these cases the intrusion on the citizen's privacy 'was so much less severe' than that involved in a traditional arrest that 'the opposing interest in crime prevention and detection and in police officer safety' could support the seizure as reasonable." *Id.* at 697–98 (quoting *Dunaway*, 442 U.S. at 209).

Although this case presents an issue of first impression for Idaho, the law in this area has been developing nationwide over the last four decades. In 1981, the U.S. Supreme Court recognized that a valid search warrant "implicitly carries with it the limited authority [for law enforcement officers] to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705. In *Summers*, the police had a warrant to search a residence for narcotics. Once they arrived, they encountered Summers leaving. The police asked Summers to help them gain access to the residence and detained him while they searched the premises. After finding narcotics in the basement and determining that Summers owned the residence, the police arrested him, searched his person, and found an envelope containing heroin. Summers was subsequently charged with possession of a controlled substance. Summers moved to suppress the evidence "as the product of an illegal search in violation of the Fourth Amendment." *Id.* at 693–94.

In *Summers*, the dispute before the U.S. Supreme Court involved the "constitutionality of a pre-arrest 'seizure' " that was "unsupported by probable cause." *Id.* at 696. As previously noted, the U.S. Supreme Court has recognized that there are some seizures that, although covered by the Fourth Amendment, are permitted because they "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause." *Id.* at 699. In deciding whether the seizure

---

*Thompson*, 114 Idaho 746, 751, 760 P.2d 1162, 1167 (1988), Phipps abandoned that issue on appeal. Instead, Phipps essentially argues that her rights under state law are coextensive with her rights under federal law, citing *Summers* and its progeny as authoritative and controlling. Similarly, the district court's decision below was based solely on Fourth Amendment considerations. Therefore, because we have not been asked to determine whether the Idaho Constitution grants additional protections not found in the Fourth Amendment, we will not address that issue.

fell within the general rule or the exception, the Court "examine[d] both the character of the official intrusion and its justification." *Id.* at 700.

As for the character of the intrusion, the Court observed that it is "[o]f prime importance . . . that the police had obtained a warrant to search respondent's house for contraband." *Id.* at 701. "A neutral and detached magistrate had found probable cause to believe the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there." *Id.* The Court also noted that the detention "was less intrusive than the search itself" and "[wa]s not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." *Id.* Further, because the detention was in the respondent's own residence, "it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 702.

As for the justifications of the intrusion, the Court articulated three: (1) "the legitimate law enforcement interests in preventing flight in the event that incriminating evidence is found"; (2) "the interest in minimizing the risk of harm to the officers"; and (3) "the orderly completion of the search" as the detainees' "self-interest may induce them to open locked doors or locked containers to avoid the use of force." *Id.* at 702–03. Over a strong dissent, the majority held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705.[4]

In 2005, the U.S. Supreme Court confirmed that *Summers* created a categorical rule: "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the

---

[4] Although this Court has not had the opportunity to discuss *Summers* in any context, the Idaho Court of Appeals has addressed it several times. *See State v. Reynolds*, 143 Idaho 911, 155 P.3d 712 (Ct. App. 2007); *State v. Pierce*, 137 Idaho 296, 47 P.3d 1266 (Ct. App. 2002); *State v. Kester*, 137 Idaho 643, 51 P.3d 457 (Ct. App. 2002). In *Pierce* and *Kester*, the court was dealing with a search warrant and conducted an ad hoc balancing test to uphold the legality of the detention. Our holding today not only extends *Summers* to parole and probation searches, but also reiterates that an officer's authority to detain incident to a search is categorical, "it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.' " *Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 705 n.19). As for *Reynolds*, the only case of the three specifically dealing with a probation search, the court did not reach the question of whether law enforcement officers can constitutionally detain individuals found on the premises of a lawful probation search because Reynolds was not on the premises being searched so *Summers* was inapplicable.

seizure.' " *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Summers*, 452 U.S. at 705 n.19). "*Summers* makes clear that when a neutral magistrate has determined police have probable cause to believe contraband exists, '[t]he connection of an occupant to [a] home' alone 'justifies a detention of that occupant.' " *Id.* at 99 n.2 (quoting *Summers*, 452 U.S. at 703–04). *Muehler* also recognized that officers are permitted to ask general questions of detainees as long as the detention is not "prolonged by the questioning." *Id.* at 101. Accordingly, the officers in that case did not need reasonable suspicion or probable cause "to ask Mena for her name, date and place of birth, or immigration status." *Id.*

Here, the district court held that *Summers* only applies to the detention of an occupant when the search is conducted pursuant to a search warrant. While the court's ruling is a logical reading of *Summers*, it does not take into account more recent decisions that have extended *Summers* to circumstances where a search warrant was not issued. *See, e.g.*, *Sanchez v. Canales*, 574 F.3d 1169, 1175 (9th Cir. 2009) *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (parole and probation searches); *People v. Rios*, 122 Cal.Rptr.3d 96, 106 (Ct. App. 2011) (probation search); *United States v. Enslin*, 327 F.3d 788, 796–97 (9th Cir. 2003) (consent search to execute an arrest warrant); *Hovington v. State*, 616 A.2d 829, 832 (Del. 1992) (arrest warrant).

Of most significance to this case, is the Ninth Circuit Court of Appeals' extension of the *Summers* rule to permit the limited detention of "the occupants of a home during a parole or probation compliance search." *Sanchez*, 574 F.3d at 1173. In *Sanchez*, probation officers began conducting random probation compliance checks on all probationers with prior arrests for robbery living within the area in response to an increase in robberies. Oscar Sanchez was one of those probationers. Records indicated that Sanchez was living at his parents' house. As it turned out, however, Sanchez was incarcerated in state prison at the time. After the officers arrived, they made the occupants—Sanchez's parents, sister, and nephew—wait outside while they conducted a search of the home for Sanchez. After about an hour of searching, the officers were unable to locate Sanchez and allowed the family back inside the home. *Id.* at 1171–72.

Sanchez's family filed a suit against the officers under 42 U.S.C. § 1983, claiming that their detention was unconstitutional. *Id*. at 1172. The officers moved for summary judgment based on qualified immunity. *Id.* The district court denied summary judgment on the unconstitutional detention claim, reasoning that "Supreme Court and Ninth Circuit case law did

not authorize Officers to detain 'third parties' on the premises while conducting a probation compliance search." *Id.* The district court held that *Muehler* was inapplicable "because the Sanchez home was subject to a warrantless probation compliance search, whereas 'important to the analysis in *Muehler* was the presence of a search warrant.' " *Id.* at 1174.

On appeal, the Ninth Circuit Court of Appeals reversed the district court, holding that "officers may constitutionally detain the occupants of a home during a parole or probation compliance search." *Id.* at 1173. The court reasoned that the three justifications set forth in *Muehler*—as originally established in *Summers*—are present in every valid home search, whether or not the search is supported by a warrant: "[T]he law should always be concerned to prevent the flight of criminals, ensure officer safety, and facilitate orderly completion of valid searches—warrant or no warrant." *Id.* at 1174. Moreover,

> Given that police officers may search the home of a parolee or probationer "without a warrant" and without "run[ning] afoul of the Fourth Amendment" so long as "the officers have [probable cause to believe] that they are at the address where . . . the parolee . . . resides," *Motley,* 432 F.3d at 1079, there is no need to be concerned that a neutral magistrate had not approved the reasonableness of the compliance search. *See generally Samson*, 547 U.S. at 848 ("[P]arolees . . . have severely diminished expectations of privacy by virtue of their status alone."); *Motley*, 432 F.3d at 1080 (implying limitations on the "the interest of third parties" who are co-occupants of a parolee's home). Just as in a search pursuant to a search warrant, therefore, "it is constitutionally reasonable to require [the occupant of a home] to remain while officers of the law execute a valid [probation compliance] search." *Summers*, 452 U.S. at 704–05.

*Id.*

The holding in *Sanchez* clearly extends *Summers* to parole and probation searches. We find there are sound reasons for this "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial," notwithstanding the absence of a search warrant. *Muehler*, 544 U.S. at 98 (citing *Summers*, 452 U.S. at 701–05). As for the character of the intrusion, it is generally the same whether the individual is detained during the execution of a search warrant or a parole search. That is, the detention is "surely less intrusive than the search itself," is "not likely to be exploited . . . because the information the officers seek normally will be obtained through the search and not through the detention," and bears "neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Summers*, 452 U.S. at 701–02.

Moreover, the governmental interests outlined in *Summers* apply with the same force to parole and probation searches as they do with searches pursuant to a search warrant. As previously noted, there are three overarching law enforcement interests whenever officers legally search a residence: (1) "preventing flight"; (2) "minimizing the risk of harm to the officers"; and (3) "the orderly completion of the search." *Id.* at 702–03. "[T]he law should always be concerned to prevent the flight of criminals, ensure officer safety, and facilitate orderly completions of valid searches—warrant or no warrant." *Sanchez*, 574 F.3d at 1174 (citing *Muehler*, 544 U.S. at 98). The reasons for this are obvious. First, there is always the possibility that an occupant will take flight in order to avoid any implication of wrongdoing. "If police officers are concerned about flight, and have to keep close supervision of occupants who are not restrained, they might rush the search, causing unnecessary damage to the property or compromising its careful execution." *Bailey v. United States*, 568 U.S. 186, 198 (2013). Therefore, "[a]llowing officers to secure the scene by detaining those present . . . prevents the search from being impeded by occupants leaving with the evidence being sought or the means to find it." *Id*. Second, officers visiting a parolee's home run a substantial risk of harm from unknown individuals leaving and reentering the home. Finally, if occupants are permitted to wander around the residence, there is the possibility that they may interfere with the execution of the parole search by "hid[ing] or destroy[ing] evidence, seek[ing] to distract the officers, or simply get[ting] in the way." *Id.* at 197. These risks are present in all residence searches, warrant or no warrant, and the government's interests in preventing these risks outweigh the slight intrusion associated with the detention. Accordingly, we find no meaningful difference between the detention of occupants present during the execution of a search warrant and the detention of occupants present during a routine parole or probation search.

The district court's decision in this case suggests that the detention should be limited to identifying new persons arriving and remaining on the premises during the parole search; any non-residents should then be permitted to leave. We decline to limit *Summers* in such a way. Requiring officers to check identification and determine whether each occupant is a resident or non-resident will be cumbersome, time consuming, distracting, and ultimately lead to prolonging the period of detention. Given the highly transient nature of many people's living arrangements, it would frequently prove impossible to ascertain a person's current residence from the information they have on hand. Further, allowing individuals to come and go defeats the

10

underlying justifications of the *Summers* rule—*i.e.*, safety and efficiency. These concerns are present whether the occupant is a resident or not.

Additionally, as the U.S. Supreme Court acknowledged in *Muehler*, officers can ask general questions of *Summers* detainees as long as the detention is not "prolonged by the questioning." 544 U.S. at 101. "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage." *Id.* (internal citations omitted) (quoting *Florida v. Bostick*, 501 U.S. 429, 435 (1991)). Accordingly, when an individual is being lawfully detained during such a search, their rights under the Fourth Amendment are not infringed by an officer's questioning, even if unrelated to the detention or the search. Therefore, we conclude that based on the holdings in *Summers*, *Muehler*, and *Sanchez*, officers have the categorical authority to detain all occupants of a residence incident to a lawful parole or probation search and to question them as long as the detention is not prolonged by the questioning. In holding to the contrary, the district court erred.[5]

The record establishes that the officers in this case were conducting a routine parole search of a parolee's residence when they detained Phipps as she was exiting a bedroom. The officers made Phipps and the parolee sit in the living room as they conducted a search of the residence. Phipps's detention was therefore permissible under *Summers* because she was present during a lawful parole search of a parolee's residence.[6] Moreover, the officer's questioning did not constitute an independent Fourth Amendment violation. Prior to the full search of the residence, an officer posed a single question to both Phipps and the parolee, asking whether there was anything in the apartment that they should know about before they searched. Phipps immediately responded that she had a methamphetamine pipe in her backpack. There is nothing in the record to suggest that the officer impermissibly prolonged the search by asking this single

---

[5] In this case, the district court similarly weighed the justifications outlined in *Summers*; however, the court looked to the specific facts of the case rather than to the nature of parole and probation searches in general—*i.e.*, the court conducted an ad hoc analysis rather than a categorical one. *See Muehler*, 544 U.S. at 98 ("An officer's authority to detain incident to a search is categorical.").

[6] This case is distinguishable from our recent opinion in *State v. Maxim*, No. 45950, 2019 WL 6519992, at *1 (Idaho Dec. 4, 2019), where we declined to condone a warrantless entry and search of a home on the basis that law enforcement later discovered the owner of the home was on probation and had waived his Fourth Amendment rights.

question prior to commencing the full search.  Therefore, based on *Summers* and its progeny, we hold that the limited detention of Phipps was reasonable under the Fourth Amendment.[7]

## IV.    CONCLUSION

For the reasons discussed above, the district court erred in reversing the magistrate court's order denying Phipps's motion to suppress. Accordingly, we reverse the district court's order. This matter is remanded to the district court with instructions to reinstate the magistrate court's order and remand the case to the magistrate court for further proceedings consistent with this opinion.


Chief Justice BURDICK, and Justices BRODY, BEVAN and STEGNER **CONCUR.**

---

[7] This case is distinguishable from our recent opinion in *State v. Maxim*, No. 45950, 2019 WL 6519992, at \*1 (Idaho Dec. 4, 2019), where we declined to condone a warrantless entry and search of a home on the basis that law enforcement later discovered the owner of the home was on probation and had waived his Fourth Amendment rights.