# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 50788

STATE OF IDAHO,             )

                               )

       Plaintiff-Respondent     )       Boise, August 2025 Term

v.                             )

                               )       Opinion Filed: December 9, 2025

KAYLEE SHANEA RAYANN HORN,  )

                               )       Melanie Gagnepain, Clerk

       Defendant-Appellant.     )

_____)

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Derrick J. O'Neill, District Judge.

The district court's judgment of conviction is <u>affirmed</u>.

Erik R. Lehtinen, State Appellate Public Defender, Boise, for Appellant. Ben P. McGreevy argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. John C. McKinney argued.

_____

BEVAN, Chief Justice.

Kaylee Horn appeals from the judgment entered upon her convictions for possession of methamphetamine and drug paraphernalia, and being a persistent violator. Law enforcement discovered the drug evidence at issue during a residence verification and probation search related to Horn's housemate, Richard Noyes, who was on probation. Horn moved to suppress the evidence, arguing the officer's entry into her home was unlawful because she was present when the officer arrived and refused to give consent. The district court denied the motion, and the case proceeded to a joint jury trial with Noyes. Both Horn and Noyes were found guilty.

On appeal, Horn raises two issues. First, she challenges the denial of her motion to suppress. Horn relies on *Georgia v. Randolph*, which holds that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." 547 U.S. 103, 120 (2006). Neither the United States Supreme Court nor Idaho's appellate courts have determined whether *Randolph* applies in cases where the objecting resident shares the

1

dwelling with an individual who has given consent through a Fourth Amendment waiver as a condition of probation or parole. Second, Horn argues the district court erred by admitting into evidence at trial a video of Noyes telling officers that he and Horn had joint ownership of drug paraphernalia found in the home. Horn argues the admission of Noyes' confession violated her Sixth Amendment confrontation rights. We affirm the district court's decisions for the reasons set forth below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Richard Noyes was sentenced to five years of probation after he pleaded guilty to possession of a controlled substance. Jaime Juarez, a probation officer with the Idaho Department of Correction, was assigned to supervise Noyes. In a separate case, Kaylee Horn was sentenced to five years of probation after she pleaded guilty to possession of a controlled substance. Horn's probation was revoked, and she was sent on a rider. Following completion of her rider her probation was reinstated. Both Horn and Noyes agreed to waive their "Fourth Amendment rights under the Idaho and United States Constitutions" as part of their probation agreements.

In August 2022, Officer Juarez knocked on the door of a residence in Boise. The residence was shared by Horn and Noyes. Horn answered the door, told Juarez that Noyes was home, and attempted to close the door on Juarez. At the time, Juarez did not know that Horn was also on probation. Juarez gained access inside the home by putting his foot in the doorway. Horn quickly ran from the front door to the downstairs bathroom where Noyes was taking a shower and Juarez followed. Juarez could hear Horn speaking to Noyes. When Horn came out of the bathroom, Juarez asked her to stay by the bathroom, but she ran to a nearby bedroom and closed the door. When Noyes came out of the bathroom, he identified himself to Juarez. At some point Horn came out of the bedroom and, while Juarez was speaking with Noyes in Horn's presence, Juarez learned that the two shared the downstairs bedroom which Horn had just come from.

Before entering the bedroom, Juarez asked Noyes, with Horn still present, if there was going to be anything in the shared bedroom that would get them in trouble. Noyes told Juarez there would be a box on the bed with possible drugs and paraphernalia. Horn indicated the same thing. Juarez entered the bedroom and found the box on the bed which contained needles and small baggies which contained a crystal-like substance. Both Noyes and Horn told Juarez that the box was not theirs because they were cleaning up the room. Noyes indicated that, on what appeared to be his side of the bed, Juarez would find another box containing paraphernalia. Horn told Juarez

2

that, on what appeared to be her side of the bed, there was another box of paraphernalia on the floor next to the nightstand. Juarez called for an assist officer.

Officer Sell responded and confirmed the identities of Horn and Noyes. Sell went to the shared bedroom and saw needles, syringes, containers, and baggies spread out on the bed. Officer Sell field tested the syringes, sealed the evidence, and logged it. The substance in the syringes was later confirmed by a forensic scientist with the Idaho State Police to be methamphetamine. Sell advised Horn and Noyes of their *Miranda* rights, and they were escorted to a police vehicle. The video from Sell's body camera was admitted into evidence at trial over an objection by Horn's counsel.[1]

At some point during this encounter, Juarez learned that Horn was also on probation. In the hearing on the motion to suppress, Juarez indicated that Horn told him about her probationary status sometime after he had placed her in restraints but before he had entered the room with drugs and paraphernalia. Juarez continued to have dialogue with Noyes and Horn after observing the paraphernalia, but only after Juarez learned Horn was also on probation. Juarez testified that Horn told him who her probation officer was, whom Juarez knew to be a felony probation officer. Juarez also testified that he knew that all Idaho felony probationers sign Fourth Amendment waivers. Nevertheless, the district court found that Horn's admission happened at an "unclear time," occurring sometime after Horn was placed in restraints but before she was informed of her *Miranda* rights.

Horn was charged with possession of a controlled substance, possession of drug paraphernalia, and the State sought a sentencing enhancement for a second controlled substance conviction under Idaho Code section 37-2739. Before trial, Horn moved to suppress the evidence arguing that Juarez's entry into her residence was unlawful because she refused to consent to his entry. The district court denied Horn's motion and the case proceeded to a jury trial.

Horn and Noyes were tried jointly. Horn was found guilty of both counts of possession and admitted to the prior conviction supporting the sentencing enhancement. Horn was sentenced to

---

[1] Horn's counsel objected prior to trial, arguing that statements made by Noyes captured on Sell's body camera violated Horn's confrontation rights under *Bruton v. United States*, 391 U.S. 123 (1968). The district court overruled Horn's *Bruton* objection and allowed the video to be introduced into evidence.

six years, with one and a half years fixed, for possession of methamphetamine and to time previously served for possession of paraphernalia. Horn appeals.

## II. ISSUES ON APPEAL

1.  Whether the district court erred by denying Horn's motion to suppress.
2.  Whether the admission of Noyes' statements at trial violated Horn's Sixth Amendment confrontation rights.

## III. STANDARDS OF REVIEW

When this Court reviews an order denying a motion to suppress, the review is bifurcated. *State v. Van Zanten*, 173 Idaho 620, 623, 546 P.3d 163, 166 (2024). The Court defers to the trial court's findings of fact, which will be upheld unless they are clearly erroneous, and freely reviews the application of constitutional principles in light of the facts found. *Id.*

The standard of review for Horn's second issue on appeal will be referenced in section IV B., below.

## IV. ANALYSIS

### A. We affirm the district court's denial of Horn's Motion to Suppress.

At the outset, it is necessary to address the district court's reasoning in denying Horn's motion to suppress. The district court relied on *State v. Phipps*, 166 Idaho 1, 454 P.3d 1084 (2019), to conclude that "[w]hether Officer Juarez was aware of Horn's probationary status is irrelevant where Noyes was on probation and Horn told Officer Juarez he was in the home" when Juarez came to verify Noyes' residence. However, the applicability of *Phipps* is questionable here based on the record before us.

In *Phipps*, we held that "officers have the categorical authority to *detain* all occupants of a residence incident to a lawful parole or probation search and to question them as long as the detention is not prolonged by the questioning." *Id.* at 8, 454 P.3d at 1091 (emphasis added). The Court in *Phipps* established that officers may *detain* all individuals present during a probation search. But the Court was silent on when an officer has authority to *enter* a premises in which a probationer and a co-occupant are present. *See id.* at 4, 454 P.3d at 1087 ("[T]here is no dispute concerning the officers' authority to enter and search the apartment. The parolee consented to suspicionless searches of his person and residence as a condition of his parole."). Because the central holding of *Phipps* did not apply explicitly to the facts presented here, the trial court's reliance on *Phipps*, without more, was in error. But that does not end our examination of this question.

4

On appeal, Horn posits that "*Phipps* is distinguishable and does not control the outcome in this case." She is correct as far as that goes, but she then relies on *Georgia v. Randolph*, 547 U.S. 103 (2006), to argue that Officer Juarez's subsequent search was unlawful. She also maintains that her own Fourth Amendment waiver cannot salvage the otherwise unreasonable entry into her home, citing our holding in *State v. Maxim*. 165 Idaho 901, 908, 454 P.3d 543, 550 (2019). But we decline to extend *Randolph* to cases like this one, and *Maxim* is distinguishable here.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." U.S. CONST. amend. IV.[2] A warrantless search is presumptively unreasonable, subject to only a few well-recognized exceptions. *See Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *State v. Hollist*, 170 Idaho 556, 561, 513 P.3d 1176, 1181 (2022). When a defendant challenges a search based on the lack of a warrant, the burden shifts to the State to prove the legality of the search. *Hollist*, 170 Idaho at 561, 513 P.3d at 1181. The State must prove the search fell within one of the exceptions to the warrant requirement or was otherwise reasonable under the circumstances. *Id.*; *State v. Hoskins*, 165 Idaho 217, 221, 443 P.3d 231, 235 (2019). The exclusionary rule generally precludes the admission of evidence obtained in violation of the Fourth Amendment. *State v. Cohagan*, 162 Idaho 717, 720, 404 P.3d 659, 662 (2017).

When it comes to the Fourth Amendment, "the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Georgia v. Randolph*, 547 U.S. 103, 115 (2006) (quoting *Minnesota v. Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring)). The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *State v. Smith*, 168 Idaho 463, 471, 483 P.3d 1006, 1014 (2021).

Horn contends that the search was unlawful under *Randolph*. In *Randolph*, the Supreme Court held that "a physically present co-occupant's stated refusal" to give consent renders a warrantless search invalid as to him. *Randolph*, 547 U.S. at 106. Randolph and his wife were having marital troubles. *Id.* at 107. After a domestic dispute, Randolph's wife complained to the

---

[2] Horn does not argue that Article 1, Section 17 of the Idaho Constitution provides greater protection than the federal constitution. Therefore, our analysis here is limited to the Fourth Amendment. *State v. Smith*, ___ Idaho ___, 569 P.3d 137, 147 n.1 (2025); *State v. Lee*, 162 Idaho 642, 647 n.1, 402 P.3d 1095, 1100 n.1 (2017)

police and told them her husband was a cocaine user and had financial troubles. *Id.* Shortly after officers arrived, Randolph returned to the residence. *Id.* Randolph's wife told officers there were "items of drug evidence" in the house. *Id.* Officers asked Randolph for permission to search the house, which he refused. *Id.* However, Randolph's wife gave permission to search, so officers searched and discovered a straw with powdery residue suspected to be cocaine. *Id.* Randolph was indicted for possession of cocaine, and he moved to suppress the evidence. The trial court denied the motion, ruling that Janet Randolph had common authority to consent to the search. *Id.* at 107-08. The Georgia appellate courts reversed, and the Supreme Court granted certiorari.

The Court considered previous "co-occupant consent" cases and held that Randolph's express refusal to give consent, despite the consent given by his co-occupant wife, rendered the search invalid as to him. *Id.* at 120. In reaching its conclusion, the Court turned to examinations of social customs and their reflection in private law. *Id.* It noted that the tenets of property law provided no controlling basis for justifying consent-based searches. *Id.* at 111. After all, landlords cannot provide consent on behalf of their tenants. *Id.* at 112 (citing *Chapman v. United States*, 365 U.S. 610, 617 (1961)). And neither can hosts provide consent on behalf of their overnight guests. *Id.* at 113 (citing *Minnesota v. Olson*, 495 U.S. 91, 110 (1990)). Rather, the Court determined that the "constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations . . . ." *Id.* at 111. Applying this logic, the Court concluded that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120.

*Randolph* admittedly draws a "fine line." *Id.* at 121. The Court has described this holding as narrow and has refused to extend the holding to other similar circumstances. *Fernandez v. California*, 571 U.S. 292, 301 (2014) (refusing to extend the reasoning in *Randolph* to situations where the police search a residence after justifiably removing the objecting cotenant from the premises); *see also United States v. Watkins*, 760 F.3d 1271, 1281 (11th Cir. 2014).

Comparing the facts of her case to those in *Randolph*, Horn argues that her attempt to shut the door on Juarez sufficiently communicated that she was refusing consent. She is correct as to this point. *State v. Reed*, 920 N.W.2d 56, 69 (Wis. 2018) ("There is perhaps no action that could more clearly communicate 'Do Not Enter' than attempting to shut a door in someone's face.").

6

Thus, Horn contends that *Randolph* is satisfied, as she was present and contemporaneously objected by attempting to close the door.

Horn also argues that her previously signed waiver cannot retroactively justify Juarez's search because he had no knowledge of Horn's probationary status when he first entered the home. As established by this Court's holding in *Maxim*, "a Fourth Amendment waiver cannot salvage an otherwise unreasonable entry into a home under the Fourth Amendment if the police officers were unaware of the waiver at the time of the unconstitutional search." 165 Idaho at 908, 454 P.3d at 550. Horn therefore argues that objecting at the door nullifies Noyes' consent, and that her own consent waiver cannot salvage Juarez's intrusion since Juarez did not know about her waiver at the time of his entry. Horn is correct that this Court's holding in *Maxim* would foreclose using her own waiver against her. But that is not the issue presented here. Neither the district court nor the State has suggested that Horn's waiver could be used against her. Rather, the argument is that Noyes' waiver justified Officer Juarez's entry and search. Therefore, this Court is left to determine whether *Randolph* forecloses the State from using Noyes' waiver to justify its search when Horn objected to the entry and search at the door.

The State offers multiple arguments in response. First, the State argues that *Randolph* is not directly applicable due to distinguishable facts. For example, it points out that neither Randolph nor his wife were on probation, and that probation searches are not analyzed in the same way as consent searches. Instead, the State contends that *State v. Barker*, 136 Idaho 728, 40 P.3d 86 (2002), controls, which holds that a co-habitant assumes the risk that the other co-habitant will consent to a search of common areas and items. *Id.* at 732, 40 P.3d at 89 (quoting *U.S. v. Matlock*, 415 U.S. 164, 171 n.7 (1974)).

Second, the State argues that *Randolph* should not be expanded to probation searches because non-probationers have a reduced expectation of privacy when living with a probationer and society has an interest in effective supervision of probationers. It points to *Smith v. City of Santa Clara*, where the question was: "Is a warrantless search of a residence that the police have probable cause to believe is the residence of a probationer, and that is otherwise reasonable as to the probationer, unreasonable as to a non-probationer occupant of the residence who is present at the time of the search and refuses to consent to the search?" 876 F.3d 987, 991 (9th Cir. 2017). The Ninth Circuit noted that "*Randolph* was a consent case." *Id.* at 993. In contrast,

the Supreme Court's probation-search cases do not rest on a consent rationale. Rather, *Griffin* used a "special needs" rationale, [*Griffin v. Wisconsin*, 483 U.S. 868, 875–76 (1987)], while *Knights* expressly eschewed the California Supreme Court's consent rationale in favor of the "totality of the circumstances" approach, [*United States v. Knights*, 534 U.S. 112, 118 (2001)]. Moreover, in a later case involving parole searches, the U.S. Supreme Court again expressly declined to employ a consent rationale. *See Samson v. California*, 547 U.S. 843, 852 n.3 (2006).

*Id.* The court noted that *Randolph* was not directly applicable and analyzed whether the search as to the non-probationer co-occupant was "reasonable under the totality of the circumstances." *Id.* at 994. The State argues that, as in *Smith*, *Randolph* is not directly applicable here.

Before addressing the merits of the State's arguments, Horn argues that the State failed to preserve them below. Because the State never argued that Horn had a reduced expectation of privacy due to her own probation agreement, she asserts that the State's "do not extend *Randolph*" argument is unpreserved. Likewise, Horn also contends that the State's "totality of the circumstances" approach is not preserved for appeal because the State limited its argument that Juarez's entry was lawful to the consent exception below. Therefore, she asserts that the State cannot argue on appeal that probation searches are analyzed differently than consent searches.

An issue is preserved for appeal if a party presents it with argument and authority or receives an adverse ruling on the issue. *State v. Miramontes*, 170 Idaho 920, 924–25, 517 P.3d 849, 853–54 (2022). Arguments refined through the appellate process are permissible while entirely new arguments are impermissible. *See State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019) ("A groomed horse is expected on appeal, but a different horse is forbidden."). Additionally, an argument may be considered for the first time on appeal if it "could not effectively surface below."). *State v. Plata*, 171 Idaho 833, 841, 526 P.3d 1003, 1011 (2023).

The State's "do not extend *Randolph*" to probation searches argument is properly before this Court. To begin, the State's argument to not extend *Randolph* is best understood as the State's *characterization* of Horn's argument. The facts in *Randolph* are distinct from the facts of this case. In *Randolph*, one resident gave their verbal consent to the police at the door, the other verbally objected. *Randolph*, 547 U.S. at 109. Neither was a probationer. *Id.* In fact, the word "probationer" never appears in the *Randolph* decision. *See generally id.* at 103. Since Horn has argued that the holding in *Randolph* should control here, she is arguing that *Randolph* should be extended. The State's counterargument is simply that—a reply in the blunt negative to Horn's own assertion.

8

Likewise, the State's arguments under *Barker* are preserved. Horn asserts that the State's *Barker* argument is unpreserved because the State only cited *Barker* to justify the search of the bedroom, but not the initial entry into the residence. The State argued below that "co-habitants assume the risk that one of them may *consent* to a search of common areas and items." The discussion centered on whether Juarez lawfully entered the bedroom, but the same legal principles apply to his entry through the front door. Thus, while this argument is refined on appeal, it is not new.

However, Horn is correct that the State did not preserve it's "totality of the circumstances" argument below. In the proceedings before the district court, the State argued this Court's decision in *State v. Gawron* permitted Juarez to enter the premises pursuant to Noyes' probation agreement. (citing 112 Idaho 841, 736 P.2d 1295 (1987)). *Gawron* analyzed the lawfulness of a probation search under the consent exception. *See* 112 Idaho at 843, 736 P.2d at 1297 ("[W]e base our determination in the instant case upon Gawron's *consent* to warrantless searches . . . ." (emphasis added)). Because the State argued that Juarez's entry was lawful under the consent exception, we hold that the alternative "totality of the circumstances" approach is not preserved for appeal.

Turning to the substance of the arguments, we hold that Juarez's entry into the home was lawful. An in-depth review of *Barker* is informative. There, John Tate was on parole and had waived his Fourth Amendment rights as a condition of parole. *Barker*, 136 Idaho at 729, 40 P.3d at 87. Ada County narcotics officers had seen Tate at Rexann Barker's apartment. This led Tate's parole officer to the apartment to confront Tate, who said he had been living at the apartment for a couple of weeks. *Id.* at 729–30, 40 P.3d at 87–88. Tate was arrested and the officers went to the apartment and contacted Barker who said Tate did not live at the apartment, but he had been there "on and off." *Id.* at 730, 40 P.3d at 88. The parole officer determined there was sufficient information to believe Tate lived in the apartment, so he searched pursuant to Tate's waiver. *Id.* The searching officers noticed that the master bedroom closet had male and female clothes. *Id.* Outside the bedroom, officers discovered a fanny pack which contained methamphetamine and a vehicle title with both Tate's and Barker's names on it. *Id.* Barker was charged with possession of the methamphetamine found in the fanny pack. *Id.*

This Court held that Tate's Fourth Amendment waiver authorized the search of the bedroom. *Id.* at 731, 40 P.3d at 89.

9

> As a condition of parole, [Tate] waived his Fourth Amendment rights. Since the Fourth Amendment specifically mentions houses as being protected by its provisions, it is objectively reasonable to conclude that such waiver constituted a consent to search any place where Tate may reside. Therefore, the district court correctly held that the scope of Tate's waiver included consent to search his residence, wherever that residence may be. Because Tate was residing with Barker at her apartment, the consent to search extended to Barker's apartment.
>
> Barker also argues that Tate's consent to search could not extend to the fanny pack because the officers knew before the search that it belonged to Barker. The authority to consent to a search is not derived from the law of property (e.g., ownership), but is based upon common authority over the property to be searched. *United States v. Matlock*, 415 U.S. 164 (1974). That common authority rests upon the mutual use of the property by persons generally having joint access or control over it for most purposes. *Id.*
>
> Because both Tate and Barker occupied the master bedroom, Tate had common authority over the bedroom sufficient for him to consent to a search of that room. His consent to search could not extend to items in the bedroom over which he had no common authority, however. When searching that room pursuant to Tate's consent, the officers could search any item in the bedroom if they had reasonable suspicion that Tate owned, possessed, or controlled the item.

*Id.*

The State argues that just like *Barker*, Noyes identified the bedroom that Horn entered as a shared bedroom. The State then combines block-quoted language from *Barker* and substitutes Horn's and Noyes' names as follows:

> Because both [Noyes] and [Horn] occupied the master bedroom, [Noyes] had common authority over the bedroom sufficient for him to consent to a search of that room. His consent to search could not extend to items in the bedroom over which he had no common authority, however. When searching that room pursuant to [Noyes'] consent, the officers could search any item in the bedroom if they had reasonable suspicion that [Noyes] owned, possessed, or controlled the item.

We hold that *Barker* is factually akin to this case and that our reasoning in *Barker* controls.

"[W]hen the basis for a search is consent, the [S]tate must conform its search to the limitations placed upon the right granted by the consent." *State v. Hansen*, 167 Idaho 831, 835, 477 P.3d 885, 889 (2020) (quotation marks and citation omitted). The language used in a probation agreement "determine[s] whether the search was objectively reasonable." *State v. Jaskowski*, 163 Idaho 257, 261, 409 P.3d 837, 841 (2018). Noyes' probation agreement contained the following clause:

> SEARCH: I consent to lawful searches by any agent of the IDOC and understand that searches may be conducted of my person, residence, vehicle, personal property,

and other real property or structures owned or leased by me, or for which I am the controlling authority. I hereby waive my Fourth Amendment rights under the Idaho and United States Constitutions concerning searches.

When Juarez knocked on the door and learned that Noyes was home, he was authorized to enter. Juarez's entry was consistent with the plain language of Noyes' probation agreement and therefore lawful. *See id.*

We further hold that Horn's refusal to give consent cannot render Juarez's entry *unlawful*. A co-tenant who shares a house with a probationer has a reduced expectation of privacy. *See State v. Johnson*, 110 Idaho 516, 523, 716 P.2d 1288, 1295 (1986). The co-tenant assumes the risk that the other co-tenant will consent to a search. *United States v. Matlock*, 415 U.S. 164, 171 (1974). If this were not the rule, a probationer could live with a non-probationer and evade searches by conceivably having the non-probationer answer the door and refuse entry every time a probation or parole officer knocked. That would effectively nullify Fourth Amendment waivers. By living with Noyes—who had waived his right to be free from searches as part of probation—Horn assumed the risk that officers would search the premises pursuant to Noyes' consent.

In *State v. Misner*, Nottingham had consented to searches as part of his probation agreement. 135 Idaho 277, 278, 16 P.3d 953, 954 (Ct. App. 2000). Nottingham's self-reported residence to his probation officer turned out to be Misner's home. *Id.* Officers attempted to contact Nottingham, so they knocked at Misner's door. *Id.* Misner answered and stepped aside so officers could ensure Nottingham was not hiding in the residence. *Id.* While there, officers could see drug paraphernalia in the kitchen and upon questioning, Misner voluntarily produced marijuana and methamphetamine. *Id.* Misner moved to suppress on the grounds that the officers' entry into the home violated her Fourth Amendment rights. *Id.*

The Court of Appeals affirmed the denial of Misner's motion to suppress, in part because "if a probationer's advance consent to search of his residence were not deemed sufficient to authorize the search of common areas shared with cohabitants, the value and effectiveness of supervised probation would be compromised." *Id.* at 280, 16 P.3d at 956. It also correctly recognized that "[defendant's] consent to searches of his residence intruded upon the Fourth Amendment privacy interest of . . . anyone else with whom [defendant] may have resided." *Id.* The authority to search "portends a massive intrusion on the privacy interests of third persons solely because they reside with a parolee." *Id.* (quotation marks and citation omitted). The court concluded that the search did not violate Misner's Fourth Amendment rights because officers

11

"reasonably believed that Nottingham resided in Misner's house and therefore possessed authority in common with Misner to consent to a search of the premises." *Id.* at 281, 16 P.3d at 957.

While neither *Misner* nor *Barker* indicates the co-tenant objected the same way as Horn did here, both cases are useful to highlight the competing interests. *See generally Misner*, 135 Idaho 277, 16 P.3d 953 (Ct. App. 2000); *Barker*, 136 Idaho 728, 729, 40 P.3d 86, 87 (2002). We follow the logic of our holding and reasoning in *Barker* to uphold the district court's denial of Horn's suppression motion here.

Thus, we reject Horn's invitation to extend *Randolph* to this circumstance. The reasoning of the Court in *Randolph* simply does not apply to probationary waivers. As noted above, the Court in *Randolph* held that the "constant element in assessing Fourth Amendment reasonableness in the consent cases, then, is the great significance given to widely shared social expectations, which are influenced by property law but not controlled by its rules." Based on this acknowledgement, the *Randolph* Court supported its holding on the basis that no social custom existed for one to enter a dwelling in the face of a tenant's objection at the door. 547 U.S. at 120. This case is different. The state's ability to conduct searches of a probationer's residence is not dependent on social custom. It is grounded in the legal agreement between the state and the probationer, totally devoid of any justification grounded in social custom. In fact, as noted above, the reasonableness of searches involving probationers is that they and their co-tenants' rights to refuse searches are significantly reduced. If it were otherwise, then the entire purpose of probationary waivers would be eviscerated.

Noyes had signed a Fourth Amendment waiver and consented to searches. "To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his *own* consent, he is free to place these items in an area over which others do *not* share access and control, be it a private room or a locked suitcase under a bed." *Randolph*, 547 U.S. at 135 (Roberts, C.J., dissenting). "[A]n otherwise reasonable warrantless search of a probationer's home is not rendered unreasonable merely because the home is occupied by another person who knows about the probation." *United States v. Harden*, 104 F.4th 830, 836 (11th Cir. 2024). Under the same logic, Horn's decision to live with Noyes "entails a limited yielding of privacy to others, and . . . the law historically permits those to whom we have yielded our privacy to in turn cooperate with the government." *Id.* at 137.

Additionally, circumstantial evidence suggests that Horn *knew* Noyes was on probation and had consented to searches which is further evidence that she had a reduced expectation of

12

privacy. Once Juarez put his foot in the door to prevent Horn from closing it, Horn ran downstairs to the bathroom Noyes was showering in. This knowledge suggests Horn had a reduced expectation of privacy.

In sum, we reject Horn's invitation to extend *Randolph* to probationary waiver cases. We hold that the consent given in a probation agreement is sufficient to establish authority to search the probationer's residence, regardless of whether a co-tenant objects to such a search. That said, co-tenants do not lose their Fourth Amendment rights just because they live with a probationer. A subsequent search must be limited to those areas police officers reasonably believe are under the control of the probationer or areas where the probationer and a co-occupant maintain shared control. *Barker*, 136 Idaho at 731, 40 P.3d at 89; *Bursch*, 905 N.W.2d at 892; *State v. Davis*, 965 P.2d 525, 533 (Utah Ct. App. 1998). That is precisely the area that was searched here.[3]

**B.      We hold that the district court's admission of Officer Sell's body camera footage was harmless.**

Horn also appeals the trial court's decision to admit Officer Sell's body camera footage, arguing that it violates her Sixth Amendment right of confrontation as explained in *Bruton v. United States*, 391 U.S. 123 (1968). We agree. But the mere existence of error does not automatically constitute reversible error. *State v. Aguilar*, 154 Idaho 201, 204, 296 P.3d 407, 410 (Ct. App. 2012); *See also Dunlap v. State*, 170 Idaho 716, 739, 516 P.3d 987, 1010 (2022). If the error alleged "did not contribute to the ensuing verdict[,]" then the error is harmless and the trial court's ruling will be affirmed. *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1125, 1138 (2020) (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991)) (internal quotation marks omitted). Thus, the district court erred in admitting the body camera footage. Even so, we affirm the judgment of conviction because the error was harmless. Horn does not get a new trial.

Horn argues that the admission of Sell's body camera footage constituted a *Bruton* violation. "*Bruton v. United States*, 391 U.S. 123 (1968), protects a defendant from incriminating out-of-court statements of a co-defendant being used against [her] in a joint trial where the co-defendant does not take the stand and thereby become[] subject to cross-examination." *State v. Gamble*, 146 Idaho 331, 337, 193 P.3d 878, 884 (Ct. App. 2008). This Court exercises free review

_____

[3] Notably, Horn does not argue that those searches were impermissible. Instead, she focuses her argument on the front door, arguing that evidence from the bedroom and box should be excluded as fruit of the poisonous tree.

over whether a defendant's confrontation rights have been violated. *State v. Hooper*, 145 Idaho 139, 142, 176 P.3d 911, 914 (2007).

The body camera footage depicts Officer Sell collecting evidence in the shared bedroom. Sell returned to the living room where Noyes and Horn were seated on a couch and read them their *Miranda* rights. Sell then asked Noyes, "So you guys are both living in that room together?" Noyes replied "Yes" Sell asked, "What's in that room?" Noyes replied, "paraphernalia shit that we [were] using." Horn then said "we were just in the process of like going through the room and making sure like, it was 100% good. That's why everything was right there, cause like we're just getting everything ready to throw away." When asked about a bag that still had crystals in it, Horn replied "like I said, it was just in the room and we were throwing everything away." The district court admitted the body camera footage over Horn's objection, finding that it did not violate *Bruton*.

Horn argues that Noyes' "we" statement regarding joint ownership of the paraphernalia violated *Bruton* because Horn only said they were cleaning up the room. She never made a statement of joint ownership or use like Noyes did. Horn says that because Noyes did not testify, his incriminating statements could not be used against her at the joint trial. She also argues that she did not adopt the statements. Below, the State argued that Horn's silence after Noyes' "we" statement constituted an adopted admission. Horn responds on appeal by pointing out that she had been read her *Miranda* rights; therefore, she had every right to remain silent without it being construed as adopting Noyes' statement.

The State disagrees, maintaining that Horn adopted Noyes' admission. The State cites Idaho Rule of Evidence 801(d)(2)(B) which states:

> (d) Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:
>> (2) Statement by Party-Opponent. The statement is offered against an opposing party and:
>>> . . . .
>>> (B) is one the party manifested that it adopted or believed to be true[.]

The State then argues that Horn's silence does not preclude adoptive admissions because Horn did not expressly invoke her right to remain silent. The State also argues that Horn's statement that "we were just in the process of going through . . . " "manifested that [Horn] adopted or believed" Noyes' "we" statement to be true. Finally, the State argues that admitting the video, if erroneous, was harmless.

14

"Adoptive admissions pose no problem under the Sixth Amendment of the United States Constitution and *Crawford* because the witness against the defendant is the defendant himself, notwithstanding that the words the defendant adoptively admitted were spoken by someone else." *People v. Armstrong*, 433 P.3d 987, 1030 (Cal. 2019) (citation modified); *see also Wilson v. United States*, 995 A.2d 174, 187 (D.C. 2010); *People v. Jennings*, 237 P.3d 474, 508 (Cal. 2010). If Horn adopted Noyes' statement, there can be no confrontation violation because the witness is Horn herself. Therefore, whether Horn adopted Noyes' statement is addressed before discussing the alleged Confrontation Clause violation.

There are two criteria for determining whether a statement is adopted. *State v. Moses*, 156 Idaho 855, 865, 332 P.3d 767, 777 (2014). First, "whether the statement was such that under the circumstances, an innocent defendant would normally be induced to respond[.]" *Id.* Second, "whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." *Id.* Horn argues that her silence after Noyes said "paraphernalia shit that we [were] using" cannot be the basis for her adopting the statement because she had been read her *Miranda* rights and therefore could remain silent.

"Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle v. Ohio*, 426 U.S. 610, 617 (1976). In *Doyle*, the Supreme Court noted that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618. Similarly, the Appeals Court of Massachusetts has held that an adoptive admission cannot be inferred from silence if the statement is made after the defendant has been placed under arrest and read her *Miranda* rights. *Commonwealth v. Ferrara*, 582 N.E.2d 961, 964 (Mass. App. Ct. 1991).

However, other courts have noted that, by selectively answering questions, a defendant waives the right to remain silent and cannot invoke the protections of *Doyle*. "The so-called 'selective silence' cases have engendered disagreement among the various jurisdictions that have addressed the issue." *Ex parte Salinas*, 664 S.W.3d 894, 911 (Tex. Crim. App. 2022). The Texas Court of Criminal Appeals noted that many, if not most, state courts to address the issue held that "a defendant who has waived his *Miranda* rights may not selectively decline to answer particular questions and still resort to the protection of *Doyle*—at least absent an express or apparent re-

15

invocation of his right to silence." *Id.*; *see also State v. Talton*, 497 A.2d 35, 44 (Conn. 1985); *People v. McReavy*, 462 N.W.2d 1, 11 (Mich. 1990); *People v. Bowman*, 136 Cal. Rptr. 3d 119, 127 (Cal. Ct. App. 2011). This rule is consistent with broader Fifth Amendment principles. "[A] defendant normally does not invoke the privilege [against self-incrimination] by remaining silent." *Salinas v. Texas*, 570 U.S. 178, 186 (2013) (plurality opinion). In other words, to invoke the right to remain silent, the defendant "must claim it." *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984) (citation omitted). "A witness does not expressly invoke the privilege by standing mute." *Salinas*, 570 U.S. at 187 (plurality opinion).

We agree that a defendant waives the right to remain silent by selectively answering questions after having been informed of *Miranda* rights. We further hold that such a defendant cannot rely on the protections found in *Doyle* unless the defendant affirmatively reasserts the right to remain silent. However, there is a wrinkle in applying such a straightforward holding to the facts of this case.

The problem with imputing Noyes' statement to Horn is that Noyes' statement came *before* Horn decided to answer Sell's questions. Had Noyes' statement been made during a back-and-forth conversation between all of the parties, then it would be a simple matter to conclude that Horn had waived her right to remain silent by the time that Noyes made his statement. But Noyes' statement came *before* Horn had waived her right to remain silent. Therefore, we conclude that Horn did not adopt Noyes' statement by remaining silent when he indicated that they were both using drugs and drug paraphernalia—because it was her constitutional right to remain silent at that time. As such, it was a violation of *Bruton* to admit the body camera video over Horn's objection.

Even so, we agree with the State that admitting the video was harmless. "Harmless error is error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Garcia*, 166 Idaho at 674, 462 P.3d at 1138 (quotation marks and citation omitted). In evaluating harmless error, courts are to weigh "the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error. *Id.* (citing *Yates*, 500 U.S. at 404). "When the effect of the error is minimal compared to the probative force of the record establishing guilt 'beyond a reasonable doubt' without error, it can be said that the error did not contribute to the verdict rendered and is therefore harmless." *Id.* (citing *Yates*, 500 U.S. at 404-05). The State bears the burden of proving an error was harmless. *Id.* at 676–77, 462 P.3d at 1140–41.

The State argues that admission of the video was harmless because, even without the video, the jury heard that Noyes and Horn told Juarez that they shared the bedroom. Juarez observed men's and women's clothing in the room corroborating the fact that Horn and Noyes shared the bedroom. Horn told Juarez there would be a box of paraphernalia on the middle of the bed. Accordingly, a jury could conclude that Horn knowingly possessed and controlled the paraphernalia and methamphetamine found in it.

Horn contends that the State has not met its burden of proving that the error was harmless. She points to the fact that both she and Noyes initially denied ownership of the box containing paraphernalia. And she argues that, absent Noyes' videoed confession, the State's "conclusory gloss on the balance of evidence" does not meet its burden of proving harmlessness.

We hold that the probative force of the record as a whole, compared to the probative force of the video, is sufficient to establish guilt beyond a reasonable doubt. *Garcia*, 166 Idaho at 670, 462 P.3d at 1134. The probative force of admitting Noyes' "we" statement was minimal. A reasonable juror would not have determined whether Horn was guilty of possession of methamphetamine in a syringe and/or drug paraphernalia based on Noyes' statement that the bedroom contained "paraphernalia shit that we [were] using"—especially since Horn provided the same information to the jury in her own statement to Officer Sell which indicated that both she and Noyes knowingly possessed the drug paraphernalia in their bedroom. Moreover, Horn made a number of additionally incriminating statements. Officer Juarez testified that when he asked Horn what he would find in the bedroom, she indicated that he would find a box of paraphernalia and methamphetamine. Horn also volunteered an explanation for the presence of the paraphernalia and methamphetamine. She explained that she and Noyes were gathering up the material to throw it away in an effort to make sure the room was "100% good."

Noyes' confession is certainly probative as to his own guilt. But as Horn points out, it is less indicative of her own. However, Horn's own statements are very probative of her guilt. Her statements, along with the other evidence proving her shared control over the space, provided the jury with sufficient evidence to find that she knew about, controlled, and possessed the paraphernalia and methamphetamine beyond a reasonable doubt. Therefore, we affirm the judgment of conviction because any error in admitting the body camera footage was harmless.

**V. CONCLUSION**

17

For the foregoing reasons, we affirm the denial of Horn's motion to suppress. We further hold that the introduction of the video evidence was harmless. Therefore, we affirm the judgment of conviction.

Justices BRODY, MOELLER, ZAHN, and MEYER concur.